JUDGE CAPRONI

**GREEN SAVITS, LLC**
25B Vreeland Road, Suite 207
Florham Park, NJ 07932
(973) 695-7777

**14 CV 8954**

**ALTERMAN & BOOP, LLP**
99 Hudson Street, 8th Floor
New York, NY 10013
(212) 226-2800
*Attorneys for Plaintiffs*



RECEIVED NOV 10 2014 U.S.D.C. S.D. N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLEG SOLOUK, OLEXIY SOLOUK, OREST YAKYMIV, VYACHESLAV MYKOLAVICH ZINCHENKO, LUKE KOCH, and ERIC LARSEN,<br><br>Plaintiffs,<br><br>vs.<br><br>EUROPEAN COPPER SPECIALISTS, INC., STALCO CONSTRUCTION, INC., ANTE MARKOTA, KEVIN G HARNEY, ALAN NAHMIAS, JOSEPH SERPE, and Individuals JOHN DOES 1-5,<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs, Oleg Solouk, Olexiy Solouk, Orest Yakimiv, Vyacheslav Mykolavich Zinchenko, Luke Koch, and Eric Larsen ("Plaintiffs"), by and through counsel, upon personal knowledge and upon information and belief, against Defendants European Copper Specialists, Inc. ("ECS"), Stalco Construction, Inc. ("Stalco"), and individual Defendants John Does 1-5 ("Defendants"), state and allege the following:

**PRELIMINARY STATEMENT**

1. Plaintiffs are six workers, originally hired by Defendant ECS, who were employed as construction carpenters, sheet metal workers and foremen in hourly, non-exempt positions subject to the prevailing wage and overtime provisions of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201, *et seq*., the New York Labor Law ("NYLL"), and the New Jersey Wage and Hour Law ("NJWHL").

2. Plaintiffs bring this action seeking monetary damages and affirmative relief based upon Defendants' violations of the FLSA, the NYLL, the NJWHL and other appropriate rules, regulations, statutes and ordinances.

3. Plaintiffs also bring this action seeking unpaid prevailing wages, as Plaintiffs performed work and furnished labor to Defendants on publicly financed construction projects, but were not paid the prevailing wages and benefits to which they were entitled.

**JURISDICTION AND VENUE**

4. The Court has original jurisdiction pursuant to 29 U.S.C. §201 *et seq*., 28 U.S.C. §§1331 and 1337, and the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. §1367.

5. This Court has jurisdiction over all state law claims brought in this action pursuant to 28 U.S.C. § 1367.

6. Venue is proper pursuant to 28 U.S.C. §1391(b) and (c) because Defendants conduct business in the State of New York and are subject to the Court's personal jurisdiction within the Southern District of New York, and a substantial part of the events and omissions giving rise to these claims occurred in the Southern District of New York.

**THE PARTIES**

7. Plaintiff, Oleg Solouk, is a resident of Lebanon, New Jersey, in the County of Hunterdon. He was employed by Defendants from in or about November, 2010 to May, 2013. He was classified by Defendants as a carpenter. While he did carpentry work, starting in January, 2011, he worked primarily as a foreman.

8. Plaintiff Olexiy Solouk is a resident of Lebanon, New Jersey in the County of Hunterdon. He was employed by Defendant from in or about April, 2011 to May, 2013. He was classified by Defendants as a laborer, however, he worked primarily as a carpenter or sheet metal worker.

9. Plaintiff Orest Yakimiv ("Yakimiv") is a resident of Lebanon, New Jersey in the County of Hunterdon. He was employed by Defendants from in or about January, 2012 to April 2012 and again from October 2012 to May 2013. He was classified by Defendants as a laborer, however, he worked primarily as a sheet metal worker.

10. Plaintiff Vyacheslav Mykolavich Zinchenko ("Zinchenko") is a resident of Kenilworth, New Jersey, in the County of Union. He was employed by Defendants from in or about July, 2012 to May, 2013. He was classified by Defendants as a laborer, however, he worked primarily as a carpenter or sheet metal worker.

11. Plaintiff Luke Koch ("Koch") is a resident of Martins Creek, Pennsylvania, in the County of Northampton. He was employed by Defendants from in or about October, 2012 to May, 2013. He was classified by Defendants as a laborer, however, he worked primarily as a sheet metal worker.

12. Plaintiff Eric Larsen ("Larsen") is a resident of Toms River, New Jersey, in the County of Ocean. He was employed by Defendants from in or about August, 2012 to May,

2013. He was classified by Defendants as a laborer; however, he worked primarily as a sheet metal worker.

13. Defendant ECS is a domestic corporation, organized and existing pursuant to the laws of the State of New Jersey with a primary address of 558 Irvine Turner Boulevard, Newark, New Jersey.

14. At all times relevant herein, ECS has been engaged in the construction business, including but not limited to, acting as a subcontractor for historic restorations, sheet metal work, roofing and carpentry.

15. At all times relevant herein, ECS has been engaged in interstate commerce or the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of the FLSA, 29 U.S.C. § 203 (b), (g), (i), (j), (r), and (s) (A) (i) and has gross receipts of more than $500,000 per year within the meaning of the FLSA, 29 U.S.C. § 203 (s) (A) (ii).

16. Defendant Stalco is a domestic corporation, organized and existing pursuant to the laws of the State of New York with a primary address of 1316 Motor Parkway, Islandia, New York.

17. At all times relevant herein, Stalco was engaged in the construction business, including but not limited to, acting as a contractor for the building and renovation of institutional and commercial facilities.

18. At all times relevant herein, Stalco engaged in interstate commerce or the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of the FLSA, 29 U.S.C. § 203 (b), (g), (i), (j), (r), and (s) (A) (i) and had gross receipts of more than $500,000

per year within the meaning of the FLSA, 29 U.S.C. § 203 (s) (A) (ii).

19. At all times relevant herein, Defendant Ante Markota ("Markota") was an owner of and actively managed ECS.

20. At all times relevant herein, Defendant Kevin G. Harney ("Harney") was the Principal and Chief Financial Officer of Stalco and was an owner of and/or actively managed Stalco.

21. At all times relevant herein, Defendant Alan Nahmias ("Nahmias") was the President of Stalco and was an owner of and/or actively managed Stalco.

22. At all times relevant herein, Defendant Joseph Serpe ("Serpe") was a Vice-President of Stalco. He supervised construction operations for Stalco and oversaw project management.

23. Serpe oversaw the management of the Pier A project on behalf of Stalco..

24. At all times relevant herein, Defendants constituted an "enterprise" within the meaning of the FLSA, 29 U.S.C. §203 (r) and (s), in that they jointly oversaw and managed the work performed by Plaintiffs on the Pier A project.

25. Defendants John Does 1-5 are fictitious names for individuals who may have operated as employers of Plaintiffs during the time period relevant to this action.

26. At all times relevant herein, Defendants conducted business within the Southern District of New York.

27. At times relevant herein, Defendants were "employers" within the meaning of the FLSA, 29 U.S.C. § 203(d), the NYLL §190 (3) and the NJWHL, N.J.S.A. § 34:11-56a1 (g).

28. At times relevant herein, Plaintiffs were "employees" within the meaning of the FLSA, 29 U.S.C. § 203 (e), the NYLL § 190(2) and the NJWHL, N.J.S.A. 34:56a1 (h).

## FACTUAL ALLEGATIONS

## PREVAILING WAGES
## MISCLASSIFICATION

29. At all times relevant herein Defendant Stalco entered into a contract with the Battery Park City Authority ("BPCA") to act as a general contractor to provide construction services for the construction of Pier A Plaza ("Pier A") adjacent to the historic Pier A building in Manhattan, New York.

30. BPCA is a public benefit corporation created under the laws of the State of New York and as such has the authority to enter into public works projects.

31. Pursuant to the public works contract between Stalco and BPCA and the NYLL §220 *et seq.*, Stalco was required to pay and ensure payment of the prevailing rates of wages and supplemental benefits to all workers furnishing labor on the Pier A project, whether workers were employed directly by Stalco or by subcontractors engaged by Stalco. Attached as Exhibit A. are the prevailing wage schedules published by the Office of the Comptroller of the City of New York from 2010 to 2013 for the positions of carpenter, laborer and sheet metal worker. The contract and the law further provided that any subcontracts entered into by Stalco must contain language requiring the payment of prevailing rates of wages and supplemental benefits to all workers furnishing labor on the Pier A project.

32. Upon information and belief, Stalco entered into a subcontracting contract with Defendant ECS to provide labor on the Pier A project. Pursuant to the contract and state law, ECS was required to pay its employees the prevailing wages and supplemental benefits for the work performed on Pier A.

33. At all relevant times herein, Plaintiffs were employees of ECS. Plaintiffs provided labor on the Pier A project. However, instead of paying Plaintiffs in accordance with

the prevailing wage schedules for much of the work performed, Defendants almost always willfully misclassified the work done by Plaintiffs in order to pay them less than the prevailing wages and benefits to which they were entitled. For example, despite the fact that Plaintiffs Oleg Solouk, Olexiy Solouk, and Zinchenko performed both carpentry and sheet metal work, Plaintiffs Koch, Larsen, and Yakimiv performed sheet metal work and Plaintiff Oleg Solouk also served as a foreman, Defendants classified all Plaintiffs as laborers, with the exception of Oleg Solouk, who was classified as a carpenter. Thus, pursuant to the schedule of prevailing wages and benefits, depending on the year, Plaintiffs were paid as little as $54.36 per hour in non-overtime wages and supplemental benefits and as much as $58.64, when they should have been paid as much as $84.65 per hour as carpenters, $87.65 as sheet metal workers and, in the case of Oleg Solouk, pursuant to the contracts for Pier A, $120.00 per hour as a foreman.

34. In addition to misclassifying Plaintiffs and not paying them the proper prevailing wages; throughout the relevant time period herein, Defendants often did not pay Plaintiffs at all. Defendant Markota would tell Plaintiffs that he had no money to pay them and that he would owe them their wages. He would pay them sporadically while he accumulated arrears. Often he would delay payment for work performed by as much as eight weeks. For many weeks, spanning from late 2012 to the second quarter of 2013, Plaintiffs were not paid at all, yet continued to work based on Markota's promises to pay them. On or about April 10, 2013, in addition to accumulated wage deficiencies and unpaid overtime accrued during the relevant time periods herein, Defendants had also accumulated 18 weeks where Plaintiffs had not received any pay at all for work they performed. At that point, Plaintiffs stopped working on the Pier A project.

35. After Plaintiffs stopped working, Defendant Serpe had a telephone conversation

with Plaintiff Oleg Solouk. Serpe promised that Stalco would fund the arrears. He also asked Oleg Solouk if he would work directly for Stalco. During the conversation, Serpe stated that the proper rate for a foreman was $120.00 per hour. He stated that Oleg Solouk should have received this rate working for ECS and that Stalco would pay him at that rate. Oleg Solouk asked Serpe if Plaintiffs were supposed to be paid at prevailing rates for work done on the Pier A project off-site. Serpe said that he would find out.

36. On or about April 19, 2013, Plaintiff Oleg Solouk was then called to a meeting with Defendants Markota, Serpe and Harney. Oleg Solouk explained that based just on the laborer rates used by ECS and the time sheets filled out pursuant to instructions by ECS, Plaintiffs estimated that they were owed approximately $171,000. This number did not take into account overtime or other payment deficiencies for hours worked. Defendant Harney asked Plaintiffs to return to work and, even though he claimed he had already paid ECS for Plaintiffs' labor (based on the lower laborer rates claimed by ECS), Stalco would pay ECS an additional $171,000 with directions that the money was to be used solely to pay Plaintiffs. Defendant Harney further stated to Oleg Solouk that if ECS did not pay the $171,000 directly to Plaintiffs, he would make up the difference himself. Plaintiffs then agreed to go back to work.

37. Upon information and belief, Stalco paid ECS $175,000 in three installments over the following month which it claimed made up for that much of the arrears Defendants owed to Plaintiffs (based on the stated rates that ECS claimed to be paying Plaintiffs; not counting other wage deficiencies such as overtime or the fact that the rates were based on misclassifications of Plaintiffs' work). However, Plaintiffs were paid only approximately, $145,000 of the $175,000 during April and May of 2013. In addition, ECS failed to pay Plaintiffs anything for the work they performed in April and May 2013, while they were receiving their partial arrears, thereby

creating new arrears.

38. On or about May 20, 2013, Plaintiffs again were forced to stop working for Defendants since they were not being paid.

39. Shortly thereafter, in a follow-up telephone conversation with Serpe and in email exchanges with Serpe and/or Harney, Oleg Solouk was asked what he thought ECS owed the workers in arrears. Oleg Solouk stated that Plaintiffs estimated the amount to be between a minimum of $300,000 to $550,000. When Serpe heard this amount, he expressed surprise and asked Oleg Solouk to explain that figure. Oleg Solouk explained that Plaintiffs had not previously counted the work they did in ECS's shop for Pier A. He further stated that ECS regularly did not pay Plaintiffs for the work performed in the shop. When ECS did pay for work performed in the shop, it would pay Plaintiffs either $25 or $30 per hour and did not pay overtime. Thus, the figure took into account unpaid shop time and overtime, along with the fact that Plaintiffs had all been misclassified. The $171,000 figure discussed in the April meeting did not take into account those other factors.

40. On or about June 13, 2013, Oleg Solouk sent an Excel spreadsheet to Harney and Serpe itemizing what he thought Plaintiffs were owed and why. In a subsequent conversation with Serpe, he reminded Serpe that Serpe said he would find out if Defendants were responsible for paying prevailing rates for work done in the off-site shop for Pier A. Serpe stated that he did not have time to check. He also stated that Plaintiffs would not be paid any arrears until Stalco had an opportunity to check their time sheets.

41. Serpe never got back to Oleg Solouk after that conversation.

42. The promise to pay and ensure payment of the prevailing wage and supplemental benefit rates for the Pier A contracts was made for the benefit of Plaintiffs who furnished labor

on the Pier A project and Plaintiffs are the third party beneficiaries of those promises and contracts entered into between Defendant Stalco and BPCA and Defendant ECS and Stalco.

43. Defendants failed to pay Plaintiffs or ensure Plaintiffs were paid the prevailing wages and supplemental benefits for work performed pursuant to the public works project contracted for on Pier A.

## PREVAILING WAGES
## OVERTIME

44. Pursuant to the public works contract for Pier A and NYLL § 220 Defendants were required to pay Plaintiffs overtime (time and a half) for any time worked on the Pier A project over eight (8) hours per day. Defendants were also required by the contract and by law to pay Plaintiffs overtime for work performed for Pier A on any Saturday.

45. As part of the Plaintiffs' daily routine, Defendant ECS had Plaintiffs report to work in the morning at its workshop in Newark, New Jersey. Plaintiffs would gather tools needed for the day, review plans, fabricate, clean and restore materials, and load their tools and materials in a van. Plaintiffs would then travel to Pier A in New York. They would then work an eight-hour day and then travel back to ECS's workshop. Plaintiffs would work at the workshop anywhere from a half-hour to two hours, fabricating, cleaning and restoring materials for the next day's work. They would then go home.

46. In a typical day, Plaintiffs would arrive at the workshop at 6:00 a.m. They would leave the shop at 6:30 a.m. and arrive at Pier A at 7:00 a.m. They would generally take a half-hour for lunch and would leave Pier A at around 3:30 p.m. They would arrive at the workshop at about 4:00 p.m. and would work up to an additional two (2) hours at the workshop.

47. Despite the fact that Plaintiffs did work for Pier A at the Newark shop and

traveled to and from the shop both before and after working at the Pier A site, Defendants failed to count <u>any</u> time worked at the shop on these days as part of the hours working on the Pier A project for which Plaintiffs were to receive prevailing wages.  Nor did Defendants count any travel time between the workshop and Pier A as being part of the day's work.  They would only count the typical eight and one half hours on the site of Pier A, minus the half hour for lunch as the time spent by Plaintiffs subject to receiving the prevailing wage.  The only instances in which Defendants would count time spent in the shop would be if Plaintiffs went to the shop for special reasons or on those rare occasions if they worked at the shop instead of going to the site due to bad weather, and then, only if the time spent in the shop would not bring their hours worked for the week over 40.  Moreover, Defendants only paid Plaintiffs $25 or $30 per hour for time worked in the shop even if the time was spent on the Pier A project or other prevailing wage work.

48. Regardless of what time in the morning Plaintiffs began work on Pier A, they were instructed by Markota to sign in at 7:00 a.m. and to sign out at 3:30 p.m. for each day. Plaintiffs were given blank time sheets for the week.  They did not contemporaneously sign in or out each day.  They were instructed to fill in the time they worked on their time sheet over the weekend and to hand in the prior weeks' time sheet on Monday.

49. Plaintiffs were told that they could not state on the time sheets that they began work before 7:00 a.m., nor could they put in time that they worked after leaving the site each day.  At times, Plaintiffs did put these additional hours on their time records, but when they did so, that time was not reflected in the payroll.  Also, they were not allowed to enter on the time sheets their travel time to and from the shop.  If any Plaintiff put in time he worked before 7:00 a.m. or time that he worked off-site on the time sheet, ECS would "fix" the time sheet so that the

sheets recorded only the time worked from 7:00 a.m. to 3:30 p.m. with a half-hour for lunch (unless overtime was worked on the site itself).  Occasionally a Plaintiff would complain about how their time sheets did not properly reflect the hours that they worked.  Markota would tell them that "if they didn't like it, they could leave," or words to that effect.

50. Pursuant to the public works contract for Pier A and NYLL §220, Defendants were required to pay Plaintiffs for overtime (time and a half) if they worked on the Pier A project on a Saturday.  If Plaintiffs actually worked on the site on a Saturday, they were paid overtime.  However, they often worked in the shop on a Saturday as part of the Pier A project.  If they did so without going to the site, they were not paid overtime.

### **REGULAR OVERTIME**

51. Plaintiffs provided labor for ECS on other projects other than Pier A. These projects included, but were not limited to projects in Newark, New Jersey; Oakland, New Jersey; Ewing, New Jersey; Jersey City, New Jersey; Yonkers, New York and Staten Island, New York. When Plaintiffs worked on these projects they were paid a standard wage of $25 or $30.00 per hour.

52. At all times relevant herein, Defendants ECS and Markota were required to pay Plaintiffs overtime pay at the statutory rate of one and one-half times their regular rate of pay for all hours worked in a workweek in excess of 40 hours.

53. On many occasions, when Plaintiffs worked overtime on the Pier A project or when they worked more than 40 hours per week on a number of projects combined, instead of paying Plaintiffs overtime, Defendant Markota would tell them to save the overtime "for a rainy day."  He would tell Plaintiffs that this was better for them because they would then get paid for

days in which they could not work and they would pay less in taxes.  By "banking" these overtime hours and paying Plaintiffs straight time on days they could not work, ECS would avoid paying Plaintiffs overtime.

54. Plaintiffs were supposed to be paid every two weeks. When they were paid, they were generally paid straight time for up to 80 hours of work during that two week period.  This was true even if they worked over 40 hours one week (thus subject to overtime) and under 40 hours the next week. Thus if a Plaintiff worked 50 hours one week (therefore entitled to time and a half for 10 hours), and 30 hours the next week, he would be paid for 80 hours for the two weeks without any overtime pay.

55. If a Plaintiff worked more than 80 hours in a two week pay period, he would have the extra hours "banked."  Those hours would sometimes be added to a pay period where he worked less than 80 hours and he would be paid straight time for those hours, thereby depriving him of overtime.  Sometimes those hours were not paid at all and would become part of the arrears owed to Plaintiffs as mentioned above.

56. For example, for the pay period of January 7-12 and January 14-19, 2013, it was recorded that Oleg Solouk worked 40 hours at Pier A in the first week, 5 hours in Staten Island, 3 hours in the shop for Pier A. In the second week it was recorded he worked 24 hours at Pier A and 8 hours in the shop for Pier A.  ECS added the 48 hours it recorded he worked the first week and the 32 hours it recorded he worked the second week and paid him for 80 hours at straight time.   It deprived him of the extra half time pay he should have received for the 8 hours of overtime he worked in the first week.  In addition, ECS refused to record 5 hours in the first week where he arrived at the shop at 6 a.m., and the 2 and a half hours he spent that week traveling back to the shop at the end of each day.  Thus he was deprived additional 7 and one

half hours of overtime that week for which he should have received time and a half. Oleg Solouk also should have been paid additional straight time for the 3 extra hours he worked in the morning of the second week and approximately the 1 and a half hours he spent in the second week traveling back to the shop at the end each day he worked.

57. Similarly, in the pay period of February 6- 11 and February 13-18, 2012, Oleg Solouk was recorded as working 8 hours at Pier A and 32 hours at the Staten Island project in the first week. In the second week he was recorded as working 38 hours at Pier A, 9 hours at Staten Island and 3 hours at the shop for Pier A. He was paid straight time for 80 hours for the pay period despite the fact that in the second week he was recorded as having worked 50 hours. Since the total hours recorded for that pay period was 90 and he was paid only for 80 hours, 10 of his hours were "banked" and he either received pay for those hours at straight time or they were included in the arrears owed to him and he was not paid at all. In addition, he was not paid for 1 ½ hours of straight time that was not recorded in the first week and 6 hours that were not recorded in the second week for traveling to and from and working at the shop at the beginning and the end of each day.

### AS AND FOR A FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT- PREVAILING WAGES

58. Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

59. Upon information and belief, the public works contract entered into by Defendants and BPCA to work on the Pier A project contained schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiffs in accordance with the provisions of NYLL § 220.

60. Those prevailing rates of wages and supplemental benefits were made part of the Pier A construction contract for the benefit of Plaintiffs.

61. Defendants unlawfully and willfully breached the Pier A construction contract by failing to pay Plaintiffs the prevailing wages and supplemental benefits to which they were entitled for all the labor they performed at Pier A.

62. Defendants unlawfully and willfully breached the Pier A construction contract by failing to pay Plaintiffs overtime for all work performed on the Pier A project that exceeded eight (8) hours per day as provided by NYLL § 220 and by the contract or that was performed off-site on Saturdays.

## AS AND FOR A SECOND CAUSE OF ACTION (PLED IN THE ALTERNATIVE) FOR UNJUST ENRICHMENT

63. Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

64. Plaintiffs have performed numerous and valuable services at the request of and for the benefit of Defendants on the Pier A project.

65. Upon information and belief, when Defendants entered into the Pier A contracts, they agreed to pay the required prevailing wages, overtime and supplemental benefit rates to Plaintiffs.

66. Upon information and belief, Defendant ECS billed Defendant Stalco and Defendant Stalco billed the BPCA at a price that anticipated labor performed by Plaintiffs at the prevailing, overtime and supplemental benefit rates for classifications of workers that paid higher than the classification of "laborer".

67. Defendants unlawfully and willfully misclassified Plaintiffs by using classifications that paid lower prevailing rates than what was calculated in the charges to BPCA and, in the case of ECS, on some occasions did not pay Plaintiffs at all, keeping money they were paid for labor to themselves.

68. As a consequence, Defendants were unjustly enriched for work and services performed by Plaintiffs in an amount which will be determined by the Court.

### AS AND FOR A THIRD CAUSE OF ACTION FOR FAILURE TO PAY OVERTIME, AN FLSA VIOLATION

69. Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

70. Defendants employed Plaintiffs on the Pier A project for work weeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the FLSA, 29 U.S.C. §207 (a) (1).

71. Defendants ECS and Markota also employed Plaintiffs to work on other projects in combination with Plaintiffs' work on Pier A for workweeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the FLSA, 29 U.S.C. §207 (a) (1).

72. As a consequence of the willful underpayment of wages, alleged above, Plaintiffs have incurred damages thereby and Defendants are indebted to them in the amount of unpaid overtime compensation, together with interest, liquidated damages, costs, and attorneys' fees in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR FAILURE TO PAY OVERTIME, A NYLL VIOLATION

73. Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

74. Defendants employed Plaintiffs on the Pier A project for work weeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the NYLL.

75. Defendants ECS and Markota also employed Plaintiffs to work on other projects in New York State, including but not limited to projects in Yonkers and Staten Island, New York, in combination with Plaintiffs' work on Pier A for workweeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the NYLL.

76. By the course of conduct set forth above, Defendants have violated NYLL §650, *et seq*. and 12 N.Y.C.R.R. § 142-2.2.

77. At all times herein mentioned Defendants had a policy and practice of refusing to pay overtime compensation to Plaintiffs.

78. Defendants' failure to pay overtime compensation to Plaintiffs was willful within the meaning of NYLL §§198 and 663.

79. As a consequence of the willful underpayment of wages, alleged above, Plaintiffs have incurred damages thereby and the Defendants are indebted to them in the amount of the unpaid overtime compensation and such other legal and equitable relief from Defendants as the Court deems just and proper.

80. Plaintiffs seek recovery of liquidated damages, attorneys' fees and costs to be paid by Defendants as provided by the NYLL.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR FAILURE TO PAY OVERTIME, A NJWHL VIOLATION

81. Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

82. Defendants employed Plaintiffs on the Pier A project which included work in Defendant ECS's workshop in Newark, New Jersey, for work weeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the NJWHL.

83. Defendants ECS and Markota also employed Plaintiffs to work on other projects in New Jersey, including but not limited to projects in Newark, Oakland and Ewing, New Jersey, in combination with Plaintiffs' work on Pier A, for workweeks longer than forty (40) hours and willfully failed to compensate them for the time worked in excess of forty (40) hours per week at a rate of one and one-half times their regular hourly rate, in violation of the requirements of the NJWHL.

84. By the course of conduct set forth above, Defendants have violated N.J.S.A. 34:11-56a (4).

85. As a consequence of the failure to pay overtime wages, alleged above, Plaintiffs have incurred damages thereby and the Defendants are indebted to them in the amount of the unpaid overtime compensation and such other legal and equitable relief from Defendants as the

Court deems just and proper.

86. Plaintiffs seek recovery of attorneys' fees and costs as provided for in N.J.S.A. 34:11-56a (25).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that they be awarded the following relief:

A. A declaration that Defendants have violated the FLSA and other applicable employment laws, and that said violations were willful;

B. Judgment against Defendants for breach of contract, in an amount to be determined by the Court;

C. Judgment against Defendants for unjust enrichment, in an amount to be determined by the Court;

D. An award of damages according to proof, including FLSA and NYLL liquidated damages, to be paid by Defendants;

E. Penalties available under applicable laws;

F. Costs of action incurred herein, including expert fees;

G. Attorneys' fees, including fees pursuant to the FLSA, the NYLL and the NJWHL, and other applicable statutes;

H. Pre-judgment and post-judgment interest, as provided by law; and

I. Such other and further equitable relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all causes of action and claims with respect to which they have a right to a jury trial.

Dated: November 5, 2014

                      Respectfully submitted,

                      GREEN SAVITS, LLC.

                      */s/ Glen D. Savits*

                      Glen D, Savits, Esq.
                      25B Vreeland Road, Suite 207
                      Florham Park, New Jersey 07932
                      Telephone: (973) 695-7777
                      Facsimile: (973) 695-7788
                      gsavits@greensavits.com

                      ALTERMAN & BOOP, LLP

                      */s/ Arlene F. Boop*

                      Arlene F. Boop
                      99 Hudson Street, 8th Floor
                      New York, New York 10013
                      Telephone: (212) 226-2800
                      Facsimile: (212) 431-3614
                      aboop@altermanboop.com