UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
OLEG SOLOUK, OLEXIY SOLOUK,                    :
OREST YAKYMIV, VYACHESLAV
MYKOLAVICH ZINCHENCO, LUKE                     :        14cv8954 (DF)
KOCH and ERIC LARSEN,

                                               :        **MEMORANDUM**
                           Plaintiffs,                  **AND ORDER**

                                               :

        -against-                              :

                                               :

EUROPEAN COPPER SPECIALTIES, INC.,
STALCO CONSTRUCTION, INC., ANTE                :
MARKOTA, KEVIN G. HARNEY, ALAN
NAHMIAS, JOSEPH SERPE, and Individuals         :
John Does 1-5,

                                               :

                           Defendants.
-----------------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

        In this case, which is before this Court on consent pursuant to 28 U.S.C. § 636(c),

plaintiffs Oleg Solouk, Olexiy Solouk, Orest Yakymiv ("Yakymiv"), Vyacheslav Mykolavich

Zinchenco ("Zinchenco"), Luke Koch ("Koch"), and Eric Larsen[1] ("Larsen") (collectively,

"Plaintiffs"), claim that defendants European Copper Specialties, Inc. ("ECS"), a subcontractor

that employed Plaintiffs to work on a New York State public works project, and Ante Markota

("Markota"), ECS's principal (together with ECS, the "ECS Defendants"), failed to pay

Plaintiffs properly for their work under the governing law.  Plaintiffs also claim that the general

contractor on the project, defendant Stalco Construction, Inc. ("Stalco"), as well as Stalco's own

principals – defendants Kevin G. Harney ("Harney"), Alan Nahmias ("Nahmias"), and

---

[1] The Court notes that, while the surname of this plaintiff is spelled "Larsen" in Plaintiffs' pleadings and motion papers, it is spelled "Larson" in the certified payroll records that have been submitted as exhibits.  (*See* Dkt. 72-32, at 1 (Certified Payroll Records).)

Joseph Serpe ("Serpe") (the "Individual Stalco Defendants" and, collectively with Stalco, the "Stalco Defendants") – were equally responsible for ensuring that Plaintiffs were properly paid for their work on the project.  Currently before the Court are a motion by the Stalco Defendants for summary judgment in their favor on all of Plaintiffs' claims against them (Dkt. 71), and a cross-motion by Plaintiffs for partial summary judgment on their claims against the Stalco Defendants (Dkt. 80-1).  For the reasons stated below, both of the pending motions are granted in part and denied in part.

## BACKGROUND

A.    **Factual Background**[2]

1.    **The Pier A Project**

On or about September 23, 2010, Stalco entered into an agreement with the Battery Park City Authority d/b/a Hugh L. Carey Battery Park City Authority (the "BPCA") to be the general contractor on a public improvement project, known as Pier A Phase III Restoration of Core & Shell General Construction Work (the "Pier A Project" or the "Project"), in Manhattan.  (Def. 56.1 Stmt. ¶ 1; *see* Attorney's Affidavit [of Joseph P. Asselta] in Support of Stalco Defendants'

---

[2] The facts summarized herein are primarily drawn from the parties' Statements pursuant to Local Civil Rule 56.1, and the evidence referenced therein.  (*See* Stalco Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated Dec. 20, 2017 ("Def. 56.1 Stmt.") (Dkt. 77); Plaintiffs' Response to Defendants' Local Rule 56.1 Statement ("Pl. 56.1 Resp.") and Plaintiffs' Counter-Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated Feb. 21, 2018 ("Pl. 56.1 Stmt.") (both filed in one document at Dkt. 80-2; sections cited separately for clarity); Stalco Defendants' Response to Plaintiffs' Counter-Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated Mar. 12, 2018 ("Def. 56.1 Resp.") (Dkt. 83).)  Unless otherwise noted in the Court's discussion, citations herein to one party's Rule 56.1 Statement, without cross-reference to the other party's Response, indicate that the cited factual assertion is not in dispute.  Where the parties' Rule 56.1 Statements suggest that relevant facts are in dispute, the Court has consulted the record and considered the parties' cited evidence.

Motion for Summary Judgment, sworn to Dec. 20, 2017 ("Asselta Aff.") (Dkt. 72), Ex. C

(Construction Agreement between Battery Park City Authority and Stalco Construction, Inc.,

dated Sept. 23, 2010 (the "Prime Contract")).)  On or about May 2, 2011, Stalco entered into a

subcontract with ECS, whereby ECS agreed to provide the labor, fabrication, materials, tools,

and equipment necessary to perform exterior restoration work associated with the Pier A Project.

(*See* Def. 56.1 Stmt. ¶ 3.)  In particular, the work performed by ECS was to include, *inter alia*,

the removal, restoration, and replacement of the Pier A building's exterior panels and ornamental

metal work.  (*See* Asselta Aff., Ex. D (Subcontract between European Copper Specialist, Inc. and

Stalco Construction, Inc., dated May 2, 2011).)

## 2.   Relevant Terms of the Prime Contract

As set out with greater specificity below, the Prime Contract contains certain provisions

addressing the compensation of workers on the Pier A Project.  Of particular relevance here is

Section 27.9 of the Prime Contract, entitled "Labor Provisions."  That section includes, *inter*

*alia*, language derived from Section 220 of the New York Labor Law (the "NYLL"), which

requires that all workers employed on a state or municipal public works project be paid not less

than the "prevailing" rate of wages for the area in which the work is performed.  (*See* Prime

Contract, at 63, § 27.9(b)(2) (making explicit Stalco's agreement to this Labor Law

requirement); N.Y. Lab. Law §§ 220(3), 220-d (setting forth this requirement, as well as the

requirement that public works contracts contain a stipulation that this requirement will be met).)

Also relevant to the compensation of workers, the Prime Contract includes a general statement

that "[a]ll employees of [Stalco] and each Subcontractor shall be paid in accordance with the

provisions of the Labor Law" (Prime Contract, at 63, § 27.9(d)), and further provides that, in the

event Stalco or any of its subcontractors were to underpay their employees, the BPCA would

have the right to withhold payments to Stalco and distribute unpaid amounts directly to the affected workers (*see id.*, § 27.9(e)).  In addition, the Prime Contract attaches, as an exhibit, a schedule of "Labor Rates," setting out the applicable hourly pay rates for workers in various craft classifications pertaining to the project.  (*Id.*, at 84.)[3]

As potentially related to the specific issue of *overtime* compensation, Section 27.9 also includes a provision – similarly derived from the NYLL – stating that no worker on the Project "shall be permitted or required to work more than eight (8) hours in any one calendar day or more than five (5) days in any one week," except in certain emergencies.  (Prime Contract, at 62-63, § 27.9(b)(2); *see* N.Y. Lab. Law § 220(2).)  Nonetheless, the "Labor Rates" schedule annexed to the Prime Contract, as referenced above (*see* Prime Contract, at 84), lists applicable overtime rates, as well as prevailing wage rates (*see id.*).

### 3.     Plaintiffs' Work on the Pier A Project

Plaintiffs were all employees of ECS, and they worked on the Pier A Project, in addition to certain other projects in which Stalco was not involved (Def. 56.1 Stmt.  ¶¶ 4, 6), until their employment with ECS was terminated in April (*id.* ¶ 5) or May of 2013 (Pl. 56.1 Resp. ¶ 5).  ECS's owner, Markota, generally controlled Plaintiffs' work schedules, at least to the extent of determining the projects to which Plaintiffs would be assigned.  (Pl. 56.1 Stmt. ¶ 8; Def. 56.1 Stmt. ¶ 11.)  ECS exclusively paid Plaintiffs' wages (Def. 56.1 Stmt. ¶¶ 7-8), and, although the extent to which the Stalco Defendants supervised Plaintiffs' work is disputed by the parties to the

_____

[3] In asserting its arguments on the pending motions, Plaintiffs also cite to Section 10.4(a) of the Prime Contract, which provides, under the heading "Subcontracts and Purchase Orders," that Stalco is "fully responsible for the work, acts and omissions of Subcontractors and materialmen . . ."   (Prime Contract, at 32, § 10.4(a).)  As discussed below, however, the Court finds that this provision has little bearing on the issue of Stalco's obligation to ensure that its subcontractors' employees were properly compensated, which is the principal subject of the parties' motions.  (*See* Discussion, *infra*, at Section III(B).)

pending motions, they agree that ECS, and not Stalco, maintained Plaintiffs' timesheets and employment records (*id.* ¶ 9).

On the days in which Plaintiffs worked on the Pier A Project, all of the Plaintiffs, except for Yakymiv, traveled to and from the Project site together, leaving from ECS's shop in New Jersey (the "Shop") in the morning, and returning there in the afternoon.[4]  Specifically, Plaintiffs (other than Yakymiv) met at the Shop sometime between 5:45 a.m. and 6:15 a.m. (Pl. 56.1 Stmt. ¶ 9; Def. 56.1 Resp. ¶ 9)[5]; Plaintiffs arrived together at the Project site between 6:45 a.m. and 7:00 a.m. (Pl. 56.1 Stmt. ¶ 10); and Plaintiffs left the Project site between 3:00 p.m. and 3:30 p.m. (Pl. 56.1 Stmt. ¶ 11).  Plaintiffs contend that, prior to their departure from the Shop each morning, they organized and loaded ECS's vehicle, and that, on many mornings, they also performed fabrication or restoration work on materials, such as metal panels and wood, for use at the Project site.  (*Id.* ¶ 9.)  The Stalco Defendants, however, generally dispute that Plaintiffs performed work of any substance at the Shop in the morning.  (Def. 56.1 Resp. ¶ 9.)  Similarly, the Stalco Defendants dispute Plaintiffs' allegations that, following their return to the Shop in the afternoon, they spent time unloading ECS's vehicle, and often performed work on building materials, as needed for the next day's work on the Project site.  (Pl. 56.1 Stmt. ¶ 12; Def. 56.1 Resp. ¶ 12.)

---

[4] On the days in which Yakymiv worked at the Pier A Project, he traveled directly to the Project site in the morning without first going to the Shop (*id.* ¶ 9), and, although he left the Project site at the same time in the afternoon as the other Plaintiffs, he did not return with them to the Shop (*id.* ¶ 11).

[5] While Plaintiffs assert that they (other than Yakymiv) arrived at the Shop between 5:45 a.m. and 6:00 a.m. (Pl. 56.1 Stmt. ¶ 9), the Stalco Defendants assert that they arrived at the Shop between 6:00 a.m. and 6:15 a.m (Def. 56.1 Resp. ¶ 9).

### 4.    Plaintiffs' Claimed <u>Underpayment for Their Work on the Project</u>

Plaintiffs contend that they were underpaid by ECS during the course of their work on the

Pier A Project (Pl. 56.1 Resp. ¶ 16), and that "Stalco learned by at least June 2013" of Plaintiffs'

underpayment by ECS (*id.*).[6]  The Stalco Defendants, however, take the position that, based on

ECS's payroll records and Plaintiffs' timesheets, ECS paid Plaintiffs all wages due to them for

hours worked on the Project.  (Def. 56.1 Stmt. ¶ 16, *see* Affidavit of Kevin G. Harney in Support

of Stalco Defendants' Motion for Summary Judgment, sworn to Dec. 19, 2017 ("Harney Aff.")

(Dkt. 75) ¶ 18.)

As noted above, it is undisputed that ECS alone maintained Plaintiffs' timesheets and

other official employment records while they were working on the Pier A Project.  (Def. 56.1

Stmt. ¶ 9.)  In addition to the timesheets that Plaintiffs submitted to ECS, though, certain of the

Plaintiffs – specifically, Oleg Solouk, Olexiy Solouk, and Larsen – kept personal calendars in

which they also recorded their daily work hours.  (Def. 56.1 Stmt. ¶ 17.)[7]  Based on the Court's

understanding of the parties' Rule 56.1 Statements, the parties appear to agree that the recorded

hours reflected in Plaintiffs' own calendars are consistent with the official timesheets maintained

by ECS.  (Def. 56.1 Stmt. ¶ 17; Pl. 56.1 Resp. ¶ 17.)  Further, the Court has reviewed what has

---

[6] The Court notes that John Noone, a Stalco construction supervisor for the Pier A Project, testified that he was informed by Oleg Solouk in April 2013 that ECS employees were being underpaid.  (Savits Decl., Ex. 4 (transcript of deposition of John Noone, conducted Sept. 2016 ("Noone Tr.")), at 13:13-15, 48:9-15.)

[7] Although Zinchenko testified that he was also in possession of personal records that would accurately demonstrate his hours worked (*see* Asselta Aff., Ex. F (transcript of deposition of Vyacheslav Zinchenko, conducted Sept. 29, 2016 ("Zinchenko Tr.")), at 20:23-22:23, 26:9-27:14), he eventually reported that he was unable to locate those records and thus did not produce them to Defendants (*see* Def. 56.1 Stmt. ¶ 18; Asselta Aff., Ex. P (email from Dylan Dindial, Esq. to Joseph Asselta, Esq., dated Nov. 7, 2016)).

been represented, at least by Oleg Solouk, to be his and Olexiy Solouk's joint personal calendar,[8] and finds that the time recorded there appears consistent with these plaintiffs' official timesheets maintained by ECS.  (*See* Asselta Aff., Ex. N (Shared Personal Calendar); Dkts. 72-17-18 (Oleg Solouk's Official Timesheets, as contained in Exhibit L to the Asselta Aff.); Dkts. 72-19-20 (Olexiy Solouk's Official Timesheets, as contained in Exhibit L to the Asselta Aff.).)[9]

Nonetheless, Plaintiffs assert that they were instructed by ECS to limit their recorded hours artificially in their official timesheets.  (Pl. 56.1 Resp. ¶ 17.)  This assertion is reflected in the deposition testimony of several of the Plaintiffs, who recounted similar instructions by ECS representatives.  In particular, Oleg Solouk testified that Markota instructed him to limit his recorded hours only to time worked at the Pier A Project site, and not to record any time spent working at the Shop (Oleg Solouk Tr., at 51:25-53:5); Olexiy Solouk and Koch testified that Markota instructed them to limit their daily recorded hours to eight hours at the Pier A Project site (Olexiy Solouk Tr., at 35:17-23; Asselta Aff., Ex. J (transcript of deposition of Luke Koch, conducted Sept. 8, 2016 ("Koch Tr.")), at 27:7-28:9); and Larsen testified that he was told by Oleg Solouk, as well as by a secretary employed by ECS, that he was required to limit his recorded time on the Project to 40 hours per week (Asselta Aff., Ex. H (transcript of deposition

---

[8] Olexiy Solouk and Oleg Solouk – father and son, respectively – lived together.  (Asselta Aff., Ex. E (transcript of deposition of Oleg Solouk, conducted Sept. 15, 2016 ("Oleg Solouk Tr.")), at 25:22-23, 35:15-21; Asselta Aff., Ex. G (transcript of deposition of Olexiy Solouk, conducted Sept. 7, 2016 ("Olexiy Solouk Tr.")), at 57:7.)  Although Oleg Solouk testified that they both maintained the same personal calendar while they were working on the Pier A Project (Oleg Solouk Tr., at 32:8-35:14), Olexiy Solouk testified that he maintained his own calendar, but was uncertain as to whether he was still in possession of it (Olexiy Solouk Tr., at 35:17-44:24).

[9] The Court has been unable to make a full comparison of Larsen's personal timesheets with his official timesheets because the copies of the latter that have been submitted to the Court are generally illegible and contain many missing dates.  (*See generally* Dkt. 72-24 (Larsen's Official Timesheets, as contained in Exhibit L to the Asselta Aff.).)

of Eric Larsen, conducted Sept. 13, 2016 ("Larsen Tr.")), at 35:25-37:16, 38:10-21).  If

Plaintiffs' assertions regarding the inaccuracy of their written timesheets (and, by extension, their

personal calendars) are credited, then they would not have been paid overtime for the hours they

claim to have worked on the Project in excess of 40 hours per week.  (*See* Pl. Mem., at 12-13.)

### B.    Procedural History

On November 10, 2014, Plaintiffs commenced this action by filing a Complaint against

ECS, Stalco, Markota, Harney, Nahmias, Serpe, and John Does 1-5 (all, collectively,

"Defendants") setting forth five claims for unpaid wages and overtime compensation.  (*See*

Complaint, dated Nov. 11, 2014 ("Compl.") (Dkt. 1).)  First, Plaintiff asserted a breach-of-

contract claim, apparently directed against Stalco, based on Stalco's alleged failure to ensure that

Plaintiffs were paid prevailing wages and overtime under the Prime Contract.  (Compl.

¶¶ 59-62.)[10]  Second, Plaintiffs pleaded, in the alternative to their contract claim, a claim for

unjust enrichment, alleging that ECS had billed Stalco, and that Stalco, in turn, had billed the

BPCA, at prices that anticipated that Plaintiffs would perform work on the Project at prevailing

wage and overtime rates that were not then paid to Plaintiffs.  (Compl. ¶¶ 64-68.)  Finally, for

their third, fourth, and fifth claims, respectively, Plaintiffs claimed that they were entitled to

---

[10] Although Plaintiffs' first cause of action, as pleaded in the Complaint, is directed
against "Defendants," Plaintiffs have made reasonably clear in their motion papers that their
contract claim is based on a theory that Plaintiffs are third-party beneficiaries to the Prime
Contract, to which only Stalco and the BPCA are parties.  (*See* Def. Mem., at 7-12; *see id.*, at 11
("Defendant Stalco is contractually liable to Plaintiffs for all unpaid wages.").)  Indeed, as the
Prime Contract is the only contract that Plaintiffs have identified, and as Plaintiffs have offered
no basis for binding any of the Individual Stalco Defendants to that contract, Plaintiffs have
shown no basis for proceeding on their contract-based claim against any defendant other than
Stalco.  *See Glob. Entm't, Inc. v. New York Tel. Co.*, No. 00cv2959 (SHS), 2000 WL 1672327, at
\*7 (S.D.N.Y. Nov. 6, 2000) (dismissing breach-of-contract claim against non-signatories to
contract on the ground that "[a] contract cannot bind a non-party unless the contract was signed
by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter
ego' of the party").

unpaid overtime compensation under the Fair Labor Standards Act of 1938 ("FLSA") (*id.* ¶¶ 70-72, the NYLL (*id.* ¶¶ 74-80), and the New Jersey Wage and Hour Law ("NJWHL") (*id.* ¶¶ 82-86).  On January 5, 2015, the Stalco Defendants filed an Answer, including various cross-claims against ECS and Markota.  (Dkt. 19.)

After numerous discovery disputes, delays, and unsuccessful attempts at settlement, the Stalco Defendants filed a motion for summary judgment on February 12, 2018.  (Dkt. 71 (Notice of Motion, dated Dec. 20, 2017[11]).)  In support of their motion, which seeks summary judgment dismissing all of Plaintiffs' claims against them, the Stalco Defendants submitted a number of affidavits and exhibits (including, *inter alia*, deposition transcripts and plaintiff time records), a memorandum of law, and their opening Local Civil Rule 56.1 Statement.  (*See* Asselta Aff.; Attorney Affidavit [of Alan Nahmias] in Support of Stalco Defendants' Motion for Summary Judgment, sworn to Dec. 20, 2017 ("Nahmias Aff.") (Dkt. 73); Affidavit of Joseph Serpe in Support of Stalco Defendants' Motion for Summary Judgment, sworn to Dec. 20, 2017 ("Serpe Aff.") (Dkt. 74); Harney Aff. (Dkt. 75); Stalco Defendants' Memorandum of Law in Support of Summary Judgment, dated Dec. 20, 2017 ("Def. Mem.") (Dkt. 76); Def. 56.1 Stmt. (Dkt. 77).)

On February 21, 2018, Plaintiffs filed an opposition to the motion and a cross-motion for partial summary judgment.  (Dkt. 80-1 (Plaintiffs' Notice of Cross Motion for Partial Summary Judgment, dated Feb. 21, 2018).)  In support, Plaintiffs also filed a memorandum of law, their responsive and affirmative Local Civil Rule 56.1 Statements, and an attorney declaration, annexing exhibits (also including, *inter alia*, deposition transcripts and time records).  (*See*

---

[11] Based on the Docket, it appears that the Stalco Defendants initially attempted to file their motion for summary judgment via the Court's Electronic Case Filing system on December 21, 2017 (*see* Dkt. 66), but, on February 6, 2018, that filing was rejected by the Clerk of Court as improper (*see* Dkt.).

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, dated Feb. 21, 2018 ("Pl. Mem.") (Dkt. 80); Pl. 56.1 Resp. (Dkt. 80-2); Pl. 56.1 Stmt. (*id.*); Declaration of Glen D. Savits in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, dated Feb. 21, 2018 ("Savits Decl.") (Dkt. 80-3).)

On March 12, 2018, the Stalco Defendants then filed a memorandum of law in reply on their motion and in opposition to the cross-motion, together with a further attorney affidavit and Local Civil Rule 56.1 Statement.  (*See* Stalco Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment, dated Mar. 12, 2018 ("Def. Reply") (Dkt. 81); Attorney's Reply Affidavit [of Joseph P. Asselta] in Support of Stalco Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion, dated Mar. 12, 2018 ("Asselta Reply Aff.") (Dkt. 82); Def. 56.1 Resp. (Dkt. 83).)

On March 22, 2018, Plaintiffs filed a letter brief in reply on their cross-motion.  (Letter to the Court from Glen D. Savits, Esq., and Arlene F. Boop, Esq., dated Mar. 23, 2018 ("Pl. Reply") (Dkt. 84).)

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157 (1970).  Accordingly, the Court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

The party opposing summary judgment may not rely upon the pleadings alone but must instead cite to "particular parts of materials in the record" or show that "the materials cited [by the movant] do not establish the absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1).  In so doing, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), but must rather present "significant probative evidence tending to support the complaint," *Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290 (1968)).  "If the evidence is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

Under this District's local rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Thus, the Court may

not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1

statement; it also must be satisfied that the moving party's assertions are supported by the record.

*See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Holtz*,

258 F.3d at 74; *Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y.

2005).

## II.     THE STALCO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFFS' STATUTORY CLAIMS FOR UNPAID OVEFRTIME COMPENSATION.

As noted above, Plaintiffs have asserted statutory claims in this case under the FLSA, the

NYLL, and the NJWHL, seeking to recover, within the coverage of each statute, overtime

compensation for the hours that Plaintiffs worked on the Pier A Project in excess of 40 hours per

week, as well as related damages and attorneys' fees.  (*See* Compl. ¶¶ 69-86 (Third, Fourth, and

Fifth Causes of Action).)  None of these claims can stand against the Stalco Defendants.  Not

only are the Stalco Defendants correct that Plaintiffs have abandoned these claims by failing to

address them in opposition to the Stalco Defendants' motion, but there is, in any event, no

evidence in the record capable of demonstrating that any of the Stalco Defendants acted as

Plaintiffs' "employer" on the Project, and thus none of the cited statutes can directly afford

coverage for Plaintiffs' overtime claims.

### A.     Applicable Legal Standards

Pursuant to the FLSA, an employee is entitled to be paid for overtime hours (*i.e.*, hours

exceeding 40 per week), at a "rate not less than one and one-half times the regular rate at which

[the employee] is employed."  29 U.S.C. § 207(a)(1).  Similarly, both the NYLL and the NJWHL

mandate payment at one and one-half times the regular normal rate for each hour worked by an

employee in excess of 40 hours per week.  *See* 12 N.Y.C.R.R. § 142-2.2; N.J.S.A. 34:11-56a(4).

The FLSA imposes liability on "employers," a group that is "broadly define[d] [to include] 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 342-43 (S.D.N.Y. 2005) (quoting 29 U.S.C. § 203(d)).  The definition of employers is similarly expansive under the NYLL and the NJWHL, each of which defines the scope of employers coextensively with the FLSA.  *De Jesus v. Empire Szechuan Noodle House Inc.*, No. 18-CV-1281 (JPO), 2019 WL 1789901, at *6 (S.D.N.Y. Apr. 24, 2019) ("courts in this Circuit have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA" (citations and internal quotation marks omitted)); *Andre v. Trinity Health Corp.*, No. 118CV03183, 2019 WL 1198959, at *6 (D.N.J. Mar. 14, 2019) ("The definitions of 'employer' and 'employee' under the FLSA and NJWHL are virtually identical.").  To determine whether a party qualifies as an "employer" under these statutes' "generous definitions," the relevant inquiry is "whether the alleged employer possessed the power to control the workers in question, . . . with an eye to the 'economic reality' presented by the facts of each case."  *Doo Nam Yang*, 427 F. Supp. 2d at 342 (quoting *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999)).

"[W]hen examining the 'economic reality' of a particular situation," courts will evaluate various factors, none of which, individually, is dispositive.  *Id*.  These factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.* (quoting *Herman,* 172 F.3d at 139).  Where a corporation is found to have acted as a plaintiff's employer, "'[t]he overwhelming weight of authority is that a corporate officer with operational control of [the] corporation's covered enterprise is an employer along with the corporation, [and is therefore]

13

jointly and severally liable under the FLSA for unpaid wages.'"  *Id.* (quoting *Moon v. Kwon,* 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002), and finding defendants jointly and severally liable under both the FLSA and the NYLL).

> **B.**    **Plaintiffs Have Abandoned Their Statutory**
> **Claims for Overtime as Against the Stalco Defendants.**

The Stalco Defendants contend that Plaintiffs have abandoned their statutory claims against them for overtime compensation under the FLSA, the NYLL, and the NJWHL (*see* Def. Reply, at 1), pointing out that, in their motion papers, Plaintiffs have not only declined to address the substance of the Stalco Defendants' arguments that they did not act as Plaintiffs' employers (*see* Def. Mem., at 17-25), but have conceded that they "are not pursuing [their] claims against the Stalco Defendants under a theory of 'joint employer'" (Pl. Mem., at 1).

The Court finds that Plaintiffs have indeed abandoned their claims for unpaid overtime wages under the NJWHL, given that they have entirely failed to address those claims, or even reference the NJWHL, in their opposition papers or in their cross-motion.  *See Kovacko v. Rockbestos Suprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (inferring that "relevant claims or defenses that are not defended have been abandoned" where plaintiffs failed to support or address their claims when opposing motion for summary judgment in multiple briefs); *see also Rosales v. Low Bid, Inc.*, No. 17CV3183, 2018 WL 3468710, at *4 (E.D.N.Y. July 3, 2018) (deeming claim under NJWHL abandoned where plaintiff's memorandum of law was silent about that claim), *report and recommendation adopted*, 2018 WL 3468697 (July 18, 2018).  As for their statutory claims for overtime under the FLSA and NYLL, Plaintiffs make no mention of these claims until their reply on their cross-motion, when they merely state that they "are entitled to overtime pursuant to the NYLL (over eight hours per day) or the FLSA (over 40 hours per week)."  (Pl. Reply, at 4).  As a party may not raise an argument for the first time on reply, *see*

*Carr v. Cty. of Sullivan*, No. 16cv06850 (NSR), 2018 WL 3733952, at \*12 n.16 (S.D.N.Y. Aug. 3, 2018), and as Plaintiffs' argument, when finally raised, is made in purely conclusory terms, the Court finds that Plaintiffs have abandoned these claims as well.

    **C.**    **No Evidence in the Record Could Support a Finding That Any of the Stalco Defendants Acted as Plaintiffs' Employer on the Project.**

In any event, the Court finds that the Stalco Defendants are entitled to summary judgment in their favor on the merits of Plaintiffs' claims for overtime pay under all three of the statutes that Plaintiffs have invoked in their Complaint.  Despite Plaintiffs' bald statement (on reply) that they are "entitled" to recover for unpaid overtime compensation under both the FLSA and the NYLL (Pl. Reply at 4), Plaintiffs have offered absolutely no evidence from which a reasonable factfinder could conclude that any of the Stalco Defendants served as Plaintiffs' "employer," so as to afford coverage under either of those statutes (or, for that matter, under the NJWHL).

There is no dispute here that Plaintiffs were employed by ECS, and, as already noted, Plaintiffs have expressly stated that they are not pursuing a "joint employer" theory of liability against the Stalco Defendants.  Moreover, as an evidentiary matter, Plaintiffs have not presented any deposition testimony or documentary evidence capable of showing that any of the Stalco Defendants had the power to hire and fire ECS employees, supervised or controlled Plaintiffs' work schedules or the conditions of their employment, determined the rate and method by which Plaintiffs were paid, or maintained records of Plaintiffs' employment.  Thus, based on the record before the Court, Plaintiffs cannot succeed on their claims against the Stalco Defendants for overtime pay under the FLSA, the NYLL, or the NJWHL, *see, e.g.*, *Tapia v. Blch 3rd Ave LLC*, 906 F.3d 58, 61 (2d Cir. 2018) (plaintiffs were not entitled to recover, *inter alia*, unpaid overtime wages from defendant under the FLSA and the NYLL where defendant was not found to be the

plaintiffs' employer), and the Stalco Defendants are entitled to summary judgment dismissing those claims.[12]

**D.**   **As It Is Not Genuinely Disputed That the Stalco Defendants Were Not Plaintiffs' Employers, Plaintiffs Also Cannot Prevail on Their FLSA Claims Against the Stalco Defendants for Travel Time and Attorneys' Fees.**

In addition to their basic claim for unpaid overtime compensation, Plaintiffs suggest that the FLSA, as amended by the Portal-to-Portal Act, 29 U.S.C. § 254, entitles them to recover unpaid overtime for the time they spent traveling to the Project site from the Shop and back again (*see* Pl. Mem., at 22-25).   The Stalco Defendants argue persuasively that Plaintiffs are precluded from pursuing that additional claim, given that, as discussed above, FLSA coverage requires a showing that Plaintiffs were employed by the Stalco Defendants, which – based on the presented evidentiary record – Plaintiffs cannot show.  (Def. Reply, at 18-19; *see* Discussion, *supra*, at Section II(C)).   Accordingly, the Stalco Defendants are also entitled to summary judgment in their favor on Plaintiffs' FLSA-based claim for unpaid travel time.[13]

Likewise, given the lack of applicability of the FLSA, the Stalco Defendants are entitled to summary judgment dismissing Plaintiffs' claims for attorneys' fees under the FLSA.  (*See* Pl. Mem., at 25 (citing 29 U.S.C.A. § 216).)   In sum, absent evidence that they served as Plaintiffs'

---

[12] This does not mean that Plaintiffs are precluded from seeking unpaid overtime compensation on their contract claim against Stalco, as discussed separately below.  (*See* Discussion, *infra*, at Sections III(C), (D).)

[13] As with Plaintiffs' claim for overtime pay, the fact that Plaintiffs have no right under the FLSA to seek compensation from Stalco for their travel time does not mean that they are necessarily barred from seeking such compensation under a contract theory.  (*See* Discussion, *infra*, at Section III(D).)

employers, the Stalco Defendants are entitled to summary judgment dismissing any claims

asserted against them that are directly based on the FLSA, the NYLL, or the NJWHL.[14]

## III.   PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR CONTRACT CLAIM AGAINST STALCO.

Although Plaintiffs do not contend that they were employed by the Stalco Defendants,

they argue that, under the first cause of action pleaded in their Complaint, Stalco is nonetheless

"contractually liable to Plaintiffs for all unpaid wages" on the Pier A Project, on the basis that

Plaintiffs were intended third-party beneficiaries of the Prime Contract, which required Stalco to

ensure that they were properly paid for their work on the Project.  (Pl. Mem., at 7-11.)  Plaintiffs

point specifically to Sections 27.9 and 10.4(a) of the Prime Contract as allegedly expressing the

contracting parties' intent that Stalco was required, in effect, to guarantee that Plaintiffs, as

employees of a Pier A Project subcontractor, received prevailing wages for their work.  (Pl.

---

[14] The Court notes that dismissal of Plaintiffs' FLSA claim, which was Plaintiffs' sole claim against the Stalco Defendants arising under federal law, deprives the Court of federal question jurisdiction over Plaintiffs' remaining claims against these defendants.  *See* 28 U.S.C. § 1331.  Further, the Court cannot exercise diversity jurisdiction in this case, given that several of the Plaintiffs are residents of New Jersey (Compl. ¶¶ 7-10, 12), and ECS, which remains a defendant in this case, is organized and headquartered in New Jersey (Compl. ¶ 13), *see Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) ("diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff" (emphasis in original))).  Nonetheless, given that Plaintiffs continue to assert FLSA claims against the ECS Defendants (*see* Compl. ¶¶ 70-72), and that those claims arise from the same facts as Plaintiffs' state-law claims against the Stalco Defendants (*see id.*), the Court, in its discretion, will continue to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.  *See Moreno v. Town of Greenburgh*, No. 13cv7101 (VB), 2014 WL 3887210, at *4 (S.D.N.Y. June 9, 2014) (retaining supplemental jurisdiction over plaintiff's state-law claims against certain defendants, despite the dismissal of all federal claims against them, where plaintiff continued to assert federal claims against other defendants in the case, and where plaintiff's state-law claims arose out of the same facts as her remaining federal claims); *see also Chenensky v. New York Life Ins. Co.*, 942 F. Supp. 2d 388, 391 (S.D.N.Y. 2013) (a district court's decision whether to exercise supplemental jurisdiction after dismissing every federal-law claim is "purely discretionary," and may consider such factors as judicial economy, convenience, fairness, and comity (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)).

Mem., at 10-12.)  Stalco, on the other hand, argues that Plaintiffs are not third-party beneficiaries of the Prime Contract, given that their employer, ECS, was not itself a party to it.  (*See* Def. Mem., at 7-10.)  The Court finds Plaintiffs' argument to be persuasive and finds, as discussed below, that Plaintiffs are third-party beneficiaries of the Prime Contract and thus entitled to proceed against Stalco for unpaid prevailing wages earned for their work on the Project.

The Court also rejects Stalco's categorical arguments that, even if Plaintiffs may recover from Stalco their unpaid "prevailing wages" for time worked on the Project, Plaintiffs' recovery should be necessarily be limited to amounts owed *only* for the first 40 hours per week that Plaintiffs worked on the job, and *only* for the time that Plaintiffs worked at the job site in New York (*i.e.,* not for time spent performing subcontract work at the Shop in New Jersey or in transit between the Shop and the job site).  (*See id.*, at 12-15, 17-25.)  Rather, the Court concludes that, for the same reasons that Stalco is liable to Plaintiffs for unpaid prevailing wages for on-site work, Stalco is equally liable to Plaintiffs for unpaid overtime compensation, calculated based on the prevailing-wage rates, for any overtime worked by Plaintiffs at the job site.  As for any hours worked by Plaintiffs *off site* and their time spent in travel, the Court finds that, while Plaintiffs may not ultimately be able to sustain their burden of demonstrating that Stalco is contractually liable for Plaintiffs' claimed unpaid wages and overtime for the hours in question, issues of fact preclude a grant of summary judgment to Stalco on this category of claimed damages.

Finally, although Stalco argues that any recovery by Plaintiffs of unpaid prevailing wages and overtime should be limited by the hours reflected in their timesheets and calendars, the Court finds that factual disputes regarding the completeness of those documentary records precludes partial summary judgment in Stalco's favor on this issue, as well.  The question of whether

Plaintiffs' hours were under-reported, both in their official time records and in their own

personal records, is a question that requires an assessment of Plaintiffs' credibility at trial.

>   A.      **Applicable Legal Standards Regarding Third-Party Beneficiaries**

Under New York law, in order for a claimant to recover as a third-party beneficiary of a

contract, the "claimant must establish that the parties to the contract intended to confer a benefit

on the third party." *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir.

2005) (citation omitted). The contract at issue must "clearly evidence" the parties' intent to

allow enforcement by the third party, *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108

(2d Cir.2009), "such that the benefit to the third party was 'sufficiently immediate, rather than

incidental, to indicate the assumption by the contracting parties of a duty to compensate [the

third party] if the benefit [was] lost,'" *Bayerische Landesbank, New York Branch v. Aladdin*

*Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (quoting *Madeira v. Affordable Hous.*

*Found.*, Inc., 469 F.3d 219, 251 (2d Cir. 2006) (internal quotation marks omitted)). The court

should consider "the circumstances surrounding the transaction as well as the actual language of

the contract" in determining whether the parties intended for the third-party to be permitted to

bring a claim enforcing it. *Subaru Distributors Corp.*, 425 F.3d at 124 (quoting Restatement

(2d) of Contracts § 302, Reporter's Note, comment a).

In the particular context of a New York public works contract, courts have held that,

where the contract expressly incorporates the requirement of Section 220 of the NYLL that the

contractor's workers on the project be paid prevailing wages,[15] those workers who are not so

---

[15] Section 220 not only requires that workers be paid at prevailing wage rates for their labor on public works projects, N.Y. Lab. Law § 220(3)(a), but further mandates that all contracts for public works projects contain an express provision "that each laborer, workman or mechanic, employed by such contractor, subcontractor or other person about or upon such public work" shall be paid prevailing wages, *id.*

paid may bring common law breach-of-contract claims, as third-party contract beneficiaries. *Ramos v. SimplexGrinnell LP*, 740 F.3d 852, 856 (2d Cir. 2014) (citing *Fata v. S.A. Healy Co.*, 289 N.Y. 401, 405 (1943)); *see also Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 613 (S.D.N.Y. 2016) ("When the relevant public works contract expressly incorporates the prevailing-wage requirement of New York law, as such contracts must, it is clear that workers may . . . sue for breach of contract as third-party beneficiaries.").[16]

There is less case law addressing to the extent to which, under New York law, a *subcontractor's* employees (as apart from the general contractor's employees), may be considered third-party beneficiaries of the prime contract for a New York public works project. The New York state courts that have been faced with the question, however, have either expressly or implicitly acknowledged that, where language mandated by Section 220 of the NYLL is included in the contract, there is no basis to distinguish, for the purpose of determining third-party-beneficiary status, between employees of the general contractor and employees of subcontractors who similarly perform work on the project. *See Wrobel v. Shaw Envtl. & Infrastructure Eng'g of New York, P.C.*, 56 Misc. 3d 798, 803-05 (Sup. Ct., N.Y. Cty. 2017) (discussing issue directly and finding that subcontractor employees have the right to enforce the prime contract's prevailing-wage requirement, as third-party beneficiaries), *aff'd* 166 A.D.3d 520 (1st Dep't 2018); *see also Wright v. Herb Wright Stucco, Inc.*, 72 A.D.2d 959, 960 (4th Dep't

---

[16] These cases note that, in this context, workers also have an administrative remedy available to them under the NYLL, but that they need not exhaust administrative remedies before pursuing a common law claim for prevailing wages under a breach-of-contract theory. *See Ramos*, 740 F.3d at 855-56 (noting that the NYLL provides an administrative mechanism for enforcement and that workers may "additionally" bring breach-of-contract claims); *Johnson*, 160 F. Supp. 3d at 613-14.

1979) (Cardamone, J. P., and Hancock, Jr., reasoning in dissent, in case where plaintiffs were employees of subcontractor, that plaintiffs should not be limited by an available administrative remedy, and that their complaint to enforce their common-law contractual rights as third-party beneficiaries of general contract therefore should not have been dismissed), *overruled and dissenting opinion adopted*, 50 N.Y.2d 837 (1980); *Juarez v. USA Roofing Co. Corp.*, No. 651437/13, 2017 NY Slip Op. 31239(U), (Sup. Ct., N.Y. Cty. June 8, 2017) ("[L]aborers who are underpaid by their subcontractor employe[r]s have a right to sue, as third party beneficiaries, the general contractor on a Public Works project for breach of contract to ensure payment to the subcontractor-employees under the prevailing wage provisions of the contract." (citing *Wright*)); *Lane v. KBC Concrete Corp.*, No. 100627/11, 2016 N.Y. Misc. LEXIS 5238, *19 (Sup. Ct., N.Y. Cty. Feb. 4, 2016) ("[W]here the Labor Law requires the inclusion of a provision for payment of the prevailing wage in a labor contract between a public agency and a contractor, the employees of subcontractors are de facto third-party beneficiaries to said public contracts for the purpose of making common law breach of contract claims against the general contractor for underpayment." (quoting *Stennett v Moveway Transfer & Stor., Inc.*, 97 A.D.3d 655, 656 (2d Dep't 2012))).

Standing in contrast to this state-law precedent is *Barragan-Aquino v. East Port Excavation & Utilities Contractors, Inc.,* No. 13-CV-343 (SJF) (ARL), 2014 WL 1117269 (E.D.N.Y. Mar. 18, 2014), in which the Eastern District of New York found that employees of a subcontractor on a New York public works project did not have third-party-beneficiary rights to sue the general contractor for unpaid prevailing wages, under the prime contract.  In reaching its decision, though, the court in *Barragan-Aquino* relied on language taken out of context from prior cases.  In particular, the court cited language in *Ramos*, 740 F.3d 852, and *Maldonado v.*

*Olympia Mechanical Piping & Heating Corp.*, 8 A.D.3d 348 (2d Dep't 2004), both of which had

involved prevailing-wage claims asserted against a general contractor by the general contractor's

own employees.  Based on the fact that the contracts at issue had included the prevailing-wage

requirement of NYLL Section 220, the courts in *Ramos* and *Maldonado* had allowed the

plaintiff-employees to maintain contract claims against the defendant-employers under a third-

party-beneficiary theory.  *See Ramos*, 740 F.3d at 858 (noting that, "in order for workers to bring

a third-party breach-of-contract claim under NYLL section 220, the contract between the

employer and the municipality must expressly state that a prevailing wage will be paid");

*Maldonado*, 8 A.D.3d at 350 (finding that "[t]he workers protected by [New York] Labor Law

§ 220 are third-party beneficiaries of the contract between their employer and the municipality").

Yet, rather than characterizing these holdings as permitting third-party-beneficiary claims against

a general contractor, *provided the prime contract incorporated the Section 220 prevailing-wage

requirement*, the court in *Barragan-Aquino* instead emphasized the fact that the third-party-

beneficiary claims in the cited cases had been permitted against the plaintiffs' *employers*,

deducing from this that the holdings were intended to preclude such claims by any job-site

workers who were not directly employed by the general contractor.  *See Barragan-Aquino*, 2014

WL 1117269, at *7-8.  In this Court's view, this deduction was not well supported by the cited

decisions – which had no reason to address, and did not address, whether the employees of

subcontractors, as well as the employees of the general contractor, were covered by the

prevailing-wage guarantees that had been invoked.[17]

---

[17] The court in *Barragan-Aquino* also held that the plaintiffs in that case could not
maintain their third-party-beneficiary contract claims because the contract at issue contained a
"negating clause," which explicitly provided that the contract was "not intended to confer any
benefit or right upon persons other than the parties" to the contract.  *Barragan-Aquino*, 2014 WL
1117269, at *8.  This holding is also questionable in light of the "strong New York public

This Court concludes that the better-reasoned authority is that of the New York state courts, which, as far as this Court has been able to determine, have uniformly allowed the employees of subcontractors on New York public works projects to assert third-party-beneficiary claims against the general contractor for breach of its contractual obligation, as mandated by Section 220 of the NYLL, to ensure the payment of prevailing wages to *all* workers on the project. This conclusion is consistent with "New York's strong commitment to ensuring the payment to laborers of a prevailing wage," *Wrobel*, 56 Misc. 3d at 805, and recognizes that, where a contractor has the obligation, under Section 220 of the NYLL, "to commit its subcontractors to paying a prevailing wage," the contractor should "bear the risk that it has hired a subcontractor who fails to pay a prevailing wage," *id.*; *see also Wright*, 72 A.D.2d at 960 (noting that Section 220 "must be construed with the liberality needed to carry out its beneficent purposes" (citation omitted)).

**B.     The Terms of the Prime Contract Give Plaintiffs
Third-Party Beneficiary Standing To Sue Stalco for
Unpaid Prevailing Wages for Their Work at the Project Site.**

In this case, as noted above, the Prime Contract between the BPCA and Stalco contains a number of provisions that address the compensation of laborers working on the Pier A Project. First, Section 27.9 of the Prime Contract, entitled, "Labor Provisions," states:

> (a)     It is hereby agreed that all applicable provisions of the
> Labor Law of the State of New York shall be carried out in
> the performance of the Work.

> (b)     Contractor [*i.e.*, Stalco] specifically agrees, as required by
> Labor Law, Sections 220 and 220-d as amended, that:

---

policy" favoring the common-law right of workers to enforce prevailing wage requirements, *see Wrobel*, 56 Misc. 3d at 806 (finding the enforcement of a negating clause in this context to be unenforceable), but, in any event, no such clause is present in the contract at issue in this case.

> (1)    no laborer, workman or mechanic, in the employ of the Contractor, Subcontractor or other person doing or contracting to do the whole or any part of the Work contemplated by the Contract documents shall be permitted or required to work more than eight (8) hours in any one calendar day or more than five (5) days in any one week, except in the emergencies set forth in the Labor Law;
>
> (2)    the wages paid for a legal day's work shall be not less than the prevailing rate of wages as set forth in the currently scheduled rates for agencies in the City of New York . . . .
>
> . . .
>
> (d)    All employees of Contractor and each Subcontractor shall be paid in accordance with the provisions of the Labor Law.

(Prime Contract, at 62-63, § 27.9.)

This section contains the mandatory language required under Section 220 of the NYLL (*see supra*, at n.15), which is sufficient to confer third-party-beneficiary standing on Plaintiffs, so that they may pursue breach-of-contract claims against Stalco for underpayment of their wages. In particular, Section 27.9(b) of the Prime Contract, as set out above, makes express reference to Section 220, and provides that Stalco "specifically agrees" that, as required by Section 220, "the wages paid for a legal day's work shall be not less than the prevailing rate of wages." (Prime Contract, at 63, § 27.9(b).) Further, Section 27.9(d) guarantees that "[a]ll employees of [Stalco] and *each Subcontractor* shall be paid in accordance with the provisions of the Labor Law." (*Id.* (emphasis added).) Taken together, these provisions can only be read as intending to confer a benefit on all workers on the Project, including the employees of both Stalco and its subcontractors. *See, e.g.*, *Fata*, 46 N.E.2d at 341 (recognizing that provisions requiring the contractor to pay prevailing wages, whether included voluntarily or as mandated by the NYLL, are, in part, for the benefit of laborers); *accord Johnson*, 160 F. Supp. 3d at 613.

24

Second, Section 27.9(e) of the Prime Contract provides that, in the event "any worker engaged in the Work by . . . any Subcontractor" is underpaid for his labor, payments due to Stalco under the contract could be withheld by the BPCA, which would then have the right to "disburse such amounts . . . for and on account of [Stalco] to the employee to whom such amount is due." (Prime Contract, at 63, § 27.9(e).)   This provision reflects that the parties further intended that Stalco, as the general contractor, would guarantee that the subcontractor employees were paid a prevailing wage.  Stalco argues that this provision is irrelevant because it did "not impose any obligations on [it]," and instead placed an obligation only on the BPCA to remit payments to underpaid workers.  (Def. Mem., at 9-10.)  The plain language of Section 27.9(e), however, indicates that the BPCA's obligation to remit payments to underpaid workers would be carried out "for and on account of [Stalco]."  (Prime Contract, at 63, § 27.9(e).)  Although Plaintiffs are not seeking to enforce the process provided by Section 27.9(e), it is relevant that the provision reflects that, in accordance with Section 220 of the NYLL, *Stalco* would ultimately "bear the risk" of Plaintiffs' underpayment by ECS.  *Wrobel*, 56 Misc. 3d at 805.[18]

---

[18] In arguing that Stalco may be held liable for Plaintiffs' unpaid wages under the Prime Contract, Plaintiffs also reference the contract provision that makes Stalco "fully responsible for the work, acts and omissions of Subcontractors and materialmen . . .," contending that this provision is "a statement of liability on the part of [Stalco] to insure compliance with all facets of the contract."  (Pl. Mem., at 10-11 (citing Prime Contract, at 32 § 10.4(a)).)  Stalco, for its part, argues that this provision is, instead, more fairly read as only making it liable to the BPCA for incomplete and defective work or materials produced by subcontractors.  (*See* Def. Mem., at 7.)  On this particular point, the Court finds Stalco's contract interpretation to be more persuasive.  The cited Section 10.4(a) is contained in a "Miscellaneous" section of the Prime Contract, separate from the "Labor Provisions" included at Section 27.9, and it makes no reference to the payment of workers' wages.  (*See* Prime Contract, at 32.)  Moreover, when read in light of Section 10.4(b), which provides that Stalco's "use of Subcontractors . . . shall not diminish [Stalco's] obligation to complete the Work in accordance with the Contract Documents" (*id.*), Section 10.4(a) appears to relate only to Stalco's responsibility for overseeing subcontractors' performance and completion of project-related work, and not to the payment of wages.  *See Jones v. Sterling Infosystems, Inc.*, 317 F.R.D 404, 409 (S.D.N. Y. 2016) ("Under the canon of construction of *noscitur a sociis*, a word that is capable of many meanings is given more precise

In an effort to avoid liability to Plaintiffs under the Prime Contract, Stalco relies on *Barragan-Aquino* to support an argument that Plaintiffs may not proceed against it on a third-party-beneficiary theory because Plaintiffs were not Stalco's own employees. (*See* Def. Mem., at 7-8.) For the reasons set forth above, the Court declines to apply that holding of *Barragan-Aquino*. In short, where, as in this case, a general contractor has entered into a public works contract incorporating the NYLL Section 220 requirement that all workers on the project be paid prevailing wages, this Court sees no principled basis for concluding that only the general contractor's own employees may assert third-party-beneficiary claims against it for breach of that requirement. Such a conclusion would be inconsistent with general principles of third-party-beneficiary law, as well as the reasoning set out in the most relevant state case law. Further, in this case, it would ignore the explicit provisions of the Prime Contract that plainly evidence that the BPCA and Stalco intended to confer the benefit of being paid prevailing wages on all workers on the Pier A Project, including those employed by subcontractors. Accordingly, with respect to all work performed at the Pier A Project site, Plaintiffs are entitled to summary judgment on the issue of whether Stalco is liable to them, under a third-party-beneficiary theory, for unpaid prevailing wages.

### C. For Work Performed at the Pier A Project Site, Plaintiffs Are Also Entitled To Recover Unpaid Overtime Compensation From Stalco, Based on the Prevailing Wage Rates.

As to Plaintiffs' claim for unpaid overtime compensation, although Plaintiffs are not entitled to proceed against the Stalco Defendants under the overtime provisions of the FLSA, the NYLL, or the NJWHL, Plaintiffs are entitled to recover for their overtime hours on their contract

---

content by the neighboring words with which it is associated." (quotation marks and citation omitted)). The Court therefore does not find, as Plaintiff urges, that Section 10.4(a) "clearly extends to the payment of prevailing wages." (Pl. Mem., at 10).

claim against Stalco under the same third-party beneficiary theory discussed above, for, at a minimum, any overtime hours worked by Plaintiffs at the job site.

As an initial matter, Stalco's argument that Plaintiffs' common law claim for unpaid overtime wages is preempted by the FLSA because the claim "is based entirely on the same facts that underlie their statutory overtime claims" (*see* Def. Reply, at 19-21) has no merit. Courts in this Circuit generally hold that "state 'common law claims are preempted to the extent they seek recovery available under the FLSA, but are not preempted to the extent that state law provides a remedy not available under federal law.'" *Griffin v. Aldi*, Inc., No. 516CV00354 (LEK) (ATB), 2016 WL 7235787, at *3 (N.D.N.Y. Dec. 14, 2016) (quoting *Gordon v. Kaleida Health*, 847 F. Supp. 2d 479, 494 (W.D.N.Y. 2012) (collecting cases)). Thus, where a breach-of-contract claim seeks recovery of unpaid wages unavailable under the FLSA, that claim will not be preempted by the FLSA. *Contrera v. Langer*, 314 F. Supp. 3d 562, 572 (S.D.N.Y. 2018); *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 463 (E.D.N.Y. 2011). Here, while Plaintiffs' breach-of-contract overtime claim is grounded in the same facts as their FLSA claim, the FLSA does not preempt the breach-of-contract claim, as the FLSA does not provide an available remedy to Plaintiffs.

Nor is Plaintiffs' claim for overtime pay barred by the fact that the language of Section 27.9(b)(1) of the Prime Contract, which provides that no person doing work on the Project "shall be permitted or required to work more than eight (8) hours in any one calendar day or more than five (5) days in any one week, except in the emergencies set forth in the Labor Law." (Prime Contract, at 62-63, § 27.9(b)(1).) This contract provision, like the provision requiring the payment of prevailing wages, was mandated by Section 220 of the NYLL. *See*

N.Y. Lab. Law § 220(2).[19]  Yet, while it may be read as regulating the conduct of Stalco and the

BPCA, as parties to the contract, it may not similarly be read as regulating the conduct of

Plaintiffs, as non-parties.

In particular, Section 27.9(b)(1) states only that no subcontractor employees "shall be

permitted or required" – *i.e.*, permitted or required *by Stalco* – to work more than eight hours per

day or five days per week.  As the prohibition is directed toward Stalco, and not toward

Plaintiffs, it cannot serve to deprive Plaintiffs of earned wages.  *See Almazo*, 2015 WL 6965116,

at *3 (finding that similar language contained in public works contract constituted an

"admonition . . . directed at the contractor," and not its employees, and thus did not preclude

breach-of-contract claims against contractor to recover unpaid overtime).  Therefore, the fact that

Stalco may have breached its contract with the BPCA by permitting Plaintiffs to work more than

eight hours per day, or five days per week, would have "no bearing on [Plaintiffs'] ability to

---

[19] This section of the NYLL states, in relevant part:

> Each contract to which the state or a public benefit corporation or a
> municipal corporation or a commission appointed pursuant to law
> is a party, and any contract for public work entered into by a third
> party acting in place of, on behalf of and for the benefit of such
> public entity pursuant to any lease, permit or other agreement
> between such third party and the public entity, and which may
> involve the employment of laborers, workers or mechanics shall
> contain a stipulation that no laborer, worker or mechanic in the
> employ of the contractor, subcontractor or other person doing or
> contracting to do the whole or a part of the work contemplated by
> the contract shall be permitted or required to work more than eight
> hours in any one calendar day or more than five days in any one
> week except in cases of extraordinary emergency including fire,
> flood or danger to life or property . . . .

N.Y. Lab. Law § 220(2).  Emergencies, under this provision, are also defined to include
situations in which the project would be unduly delayed, absent overtime work.  *Id.*  Overtime
work is supposed to be preapproved by the Commissioner of the New York State Department of
Labor ("DOL") before employees are paid at a premium overtime rate.  *See id.*

recover[,] as[] third party beneficiar[ies]," unpaid overtime wages for hours that Plaintiffs worked on the Pier A Project. *Id.*

Further, even if Stalco unlawfully permitted Plaintiffs to engage in overtime work on the Project absent an emergency, such an NYLL violation would not bar Plaintiffs from maintaining their claim against Stalco to recover overtime wages that were earned but not received. In light of "New York's strong commitment to ensuring the payment to laborers of a prevailing wage," *Wrobel*, 56 Misc. 3d at 805, courts are highly reluctant to apply the NYLL in a way that would deny workers overtime wages that they otherwise earned, *see Almazo*, 2015 WL 6965116, at *3 ("Using a statute []designed [to protect workers] to deny workers overtime pay would achieve the opposite of the legislature's intended end."); *see also Bucci v. Vill. of Port Chester*, 22 N.Y.2d 195, 201 (1968) ("This court has more than once noted that section 220 must be construed with the liberality needed to carry out its beneficent purposes."); *Schlessinger v. Valspar Corp.*, 686 F.3d 81, 86 (2d Cir. 2012) (noting that "courts are especially skeptical of efforts by clients or customers to use public policy as a sword for personal gain rather than a shield for the public good" (quoting *Benjamin v. Koeppel*, 85 N.Y.2d 549, 553 (1995) (internal quotation marks omitted)). Thus, if Plaintiffs worked any overtime hours at the Project job site, then, consistent with State policy, it would be inappropriate to deny them recovery of unpaid overtime wages for those hours on the basis that the work was allowed by Stalco in violation of the NYLL.

As for the hourly rate at which Plaintiffs are entitled to recover unpaid overtime compensation, it is settled law that, where premium overtime rates are incorporated into a contract, underpaid employees who are third-party beneficiaries of the contract may recover unpaid overtime compensation at those rates. *Almazo v. M.A. Angeliades, Inc.*, No. 11cv1717

(MGC), 2015 WL 6965116, at *3 (S.D.N.Y. Nov. 10, 2015), *see also Carrion v. AGFA Constr. Inc.*, No. 10 CIV. 3327 (BMC), 2011 WL 13128122, at *7 (E.D.N.Y. May 12, 2011), *aff'd*, 720 F.3d 382 (2d Cir. 2013) (plaintiff was entitled to bring claim for unpaid overtime wages where overtime was incorporated into the public works contract).  Here, Section 27.9(b)(3) of the Prime Contract provides that "[t]he minimum hourly rate of wage to be paid shall be not less than that stated in the Contract Documents" (Prime Contract, at 63, § 27.9(b)(3)), and the Prime Contract also includes a schedule of both the minimum (prevailing wage) rates and the overtime rates to be paid for different classifications of workers (*id.*, at 84).  That schedule reflects an implicit acknowledgement that, if it were necessary to pay overtime, then the workers' overtime compensation would be calculated as 150 percent of the prevailing wage rates.  (*See id.*)  Indeed, just as Section 220 of the NYLL dictates that workers on public works projects are to be paid prevailing wages, N.Y. Lab. Law § 220(3), the statute also states that, where the New York State DOL has determined that an emergency exists and that overtime work is therefore necessary on a public works project, workers are to be paid, for their overtime hours, "a premium wage commensurate with the premium wages prevailing in the area in which the work is performed," *id.* § 220(2).

The Prime Contract thus evidences the contracting parties' intention that workers on the Project, including Plaintiffs, who worked in excess of eight hours per day or five days per week, would be entitled to recover unpaid overtime compensation based on the prevailing wage rates set out in the applicable contract schedule.  Accordingly, Plaintiffs are entitled to summary judgment that Stalco is liable to them for both unpaid prevailing wages and unpaid overtime (based on the prevailing wage rates) for the time Plaintiffs spent working on the Project, at least at the Pier A Project site.

**D.    Issues of Fact Preclude Summary Judgment in Favor of Either Plaintiffs or Stalco on the Question of Whether Plaintiffs May Recover Unpaid Wages or Overtime for Work Performed Off Site.**

Plaintiffs contend that they are additionally entitled to recover wages for all work on the Pier A Project that they performed at the Shop (*see* Pl. Mem., at 15-22), regardless of the fact that such work was performed off site and outside of the State of New York.  Plaintiffs also contend that they are entitled to be paid for their travel time to and from the Shop (*see id.*, at 22-25), although they primarily appear to rest that argument on the requirements of the FLSA, which, as discussed above, cannot afford them a basis for relief.  Stalco, meanwhile, argues that, even if Plaintiffs have third-party-beneficiary rights to enforce the Prime Contract, those rights cannot be read to extend to payment for off-site work.  (*See* Def. Mem., at 12-15.)  The Court finds that, while Plaintiffs are not precluded as a matter of law from recovering compensation for their off-site work and travel, the evidence that has been presented on the parties' motions reflects factual disputes that are material to the question of whether, or to what extent, Plaintiffs may recover such compensation here.

**1.    The Prime Contract Does Not, on Its Face, Limit Stalco's Payment Obligations to Work Performed On Site.**

The threshold question posed by Plaintiffs' claim for payment by Stalco for off-site work is whether the provisions of the Prime Contract that give rise to Plaintiffs' third-party-beneficiary claims should be read as limiting Stalco's guarantee of worker wages to work performed at the Project site.  The Court finds no such limitation on the face of the contract.

First, the section of the Prime Contract that specifically recites the prevailing-wage requirement (Prime Contract, at 63, § 27.9(b)(3)), refers only to wages to be paid "for a legal day's work" (*id.*), and makes no reference, of any kind, to where that work must be performed.

Second, the section of the Prime Contract that prohibits Stalco from permitting or requiring laborers to work overtime (*id.*, at 62-63, § 27.9(b)(1)) broadly refers to this protection as applying to laborers in the employ of Stalco, or in the employ of a subcontractor, or in the employ of any other person "doing or contracting to do the whole or any party of the Work contemplated by the Contract documents" (*id.*), again without specifying that such work could only be performed on site.

Third, the contract generally requires that "all applicable provisions of the [NYLL] shall be carried out in the performance of the Work" (*id.*, at 62, § 27.9(a); *see also id.*, at 9, § 2.1 (defining "Work" to include "all labor and work to be performed and completed by [Stalco] as required in the Contract Documents . . . .")),[20] and the provision of the NYLL that is particularly applicable here does not necessarily apply only to on-site work.  Rather, the statute states:

> The wages to be paid for a legal day's work . . . to laborers, workmen or mechanics upon any material to be used upon or in connection therewith, shall be not less than the prevailing rate for a day's work in the same trade or occupation in the locality within the state where such public work . . . is to be situated, erected or used.  Such contracts shall contain a provision that each laborer,

---

[20] The Prime Contract further provides that it is the "intent of the Contract Documents," in relevant part, "to include in the Work all labor and materials, . . . tools, equipment, . . . transportation, . . . and other professional services . . . and any other items required to execute and complete the Work satisfactorily and in accordance with the Contract Documents."  (Prime Contract, at 10, § 2.3(a).)  The contract also describes Stalco's responsibilities for the Contract Work in broad terms:

> [Stalco] shall perform and complete the Work in accordance with the true intent and meaning of the Contract Documents and shall perform all work incident thereto or as is usually performed in connection therewith or as is reasonably inferable therefrom, it being the intention that all work usually performed by the trade covered by this Agreement and necessary to produce the intended result be performed by [Stalco] whether or not specifically covered by the Contract Documents.

(*Id.*)

32

> workman or mechanic, employed by such contractor, subcontractor
> or other person *about or upon such public work*, shall be paid the
> wages herein provided.

N.Y. Lab. Law § 220(3)(a) (emphasis added).  When called upon to construe the phrase "on,

about or upon such public work" (*i.e.*, virtually identical language, as found in a preceding

version of the statute), the New York Court of Appeals, in *Ewen v. Thompson-Starrett Company*,

208 N.Y. 245 (1913), found it "unwise . . . to undertake a precise definition," *id.* at 251,

concluding only that "quarrymen and stonecutters in Maine were not employed 'on, about or

upon' the public work of constructing the municipal building in the city of New York within the

intent of the act," *id.*

Thus, while a supplier's mere provision of materials (sourced or manufactured off site) to

a public works project is insufficient to trigger the prevailing-wage obligations of the general

contractor, as mandated by the NYLL, for the cost of the labor needed to obtain or manufacture

the materials, *see id.* at 248-50; *see also, e.g.*, *Ramaglia v. New York State Dep't of Trans.*, 5

A.D.3d 909, 910-11 (3rd Dep't 2004) (noting that prevailing-wage law "does not include

contracts for the sale of goods used in public works projects," and that "[t]his is true even where

a manufacturer creates a custom product or performs finishing work on the materials before

delivery" (internal quotation marks and citations omitted)), the statutory limitation of "about or

upon such public work" does not create a bright-line rule that *any* type of work related to the

project, yet performed off site, is necessarily excluded from the coverage of that obligation.

Certainly, the phrase "*about* . . . such public work" would be redundant, if it were read to mean

that only work physically performed "upon" the public work could be covered by the prevailing

wage requirement.

Finally, Stalco has not advanced an argument in its summary judgment briefing that the Prime Contract's Labor Provisions should be read to exclude any responsibility for the labor costs of work performed off site, regardless of the nature of that work.  Rather, Stalco has focused its arguments on these propositions:  (1) that Plaintiffs' work at the Shop cannot be compensated under the Prime Contract because that work was performed in *New Jersey*, where it was purportedly outside the territorial reach of the NYLL (Def. Mem., at 12-13); (2) that the Shop, in particular, was "neither a designated nor dedicated site for th[e] Project," and that Plaintiffs have failed to submit evidence to support an argument that their work at the Shop was of the type "customarily and normally done at the project site" (*id.*, at 14-15); and (3) that Plaintiffs cannot recover for travel time between the Shop and the job site because the only argument they advanced to recover for such time was under the FLSA, which does not apply to Stalco (Def. Reply Mem., at 18-19).  Thus, even Stalco appears to concede that there could be circumstances in which the Prime Contract – if enforceable under a third-party-beneficiary theory – *could* cover off-site work – although Stalco contends that, on the facts of this case, the Court should find that it does not cover the specific off-site work for which Plaintiffs are seeking compensation.

> **2.  The Fact That the Labor Provisions of the Prime Contract Are Based on the NYLL Does Not Necessarily Mean That the Contract Cannot Be Enforced With Respect to Work Performed in New Jersey.**

As the prevailing wage and overtime guarantees of the Prime Contract were mandated by the NYLL (and as Stalco's contractual obligation was to comply with the requirements of the NYLL), the Court must also consider whether the NYLL itself may be applied to cover work performed by Plaintiffs in New Jersey.  Although the NYLL is "silent on its extraterritorial application," *Warman v. Am. Nat'l Standards Inst.*, No. 15cv5486 (RA), 2016 WL 3676681, at

*2 (S.D.N.Y. July 6, 2016), it is generally well settled that, "unless expressly stated otherwise, no [state] legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it," *Magnuson v. Newman*, No. 10cv6211 JMF, 2013 WL 5380387, at *5 (S.D.N.Y. Sept. 25, 2013), and courts have noted that this presumption applies to the NYLL, *see id.*; *see also, e.g.*, *Warman*, 2016 WL 3676681, at *2 (collecting cases), *Rosales*, 3468710, at *7; *Aminov v. EC Commodities Corp.*, No. 16CV4800, 2017 WL 9511075, at *3 (E.D.N.Y. July 6, 2017), *report and recommendation adopted*, 2018 WL 542245 (Jan. 24, 2018); *Rodriguez v. KGA Inc.*, 155 A.D.3d 452, 453 (1st Dep't 2017); *O'Neill v. Mermaid Touring, Inc.*, 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013); *Ewen*, 208 N.Y. at 247-48.

Nonetheless, the presumption against extraterritorial application of the NYLL does not control in all circumstances.  In *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519 (1994), the plaintiff, a New York resident who was injured on a job site in Massachusetts that was owned by a New York corporation, sued the corporation for alleged violations of the provisions of the New York Labor Law that require adequate safety measures at a worksite.  The New York Court of Appeals declined to adopt an absolute bar to suit based on the fact that the work was performed out-of-state (the position urged by one judge on the panel, *see id.* at 523-24 (Titone, J., concurring)), and instead applied New York choice-of-law principles to determine that, on the particular tort claim at issue, Massachusetts had the greater interest, and thus its law should control, *id.* at 521-23.  More recently, in *Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*, No. 13-CV-6789, 2015 WL 5567073 (E.D.N.Y. Sept. 21, 2015) – a case in which the plaintiff, a delivery driver who had made deliveries both in and out of state for his New-York-based employer, claimed minimum wage and overtime violations under the NYLL – the Eastern District denied the defendant's motion for summary judgment on the issue of the extraterritorial

reach of the statute, on the ground that the defendant had failed to make the choice-of-law analysis called for by *Padula*, and thus had not carried its burden, *see id.* at \*9 (noting that the court in *Padula* declined to "apply a bright-line rule against [the] application of the NYLL to any conduct taking place outside New York state," but rather "engaged in a more flexible analysis," based on choice-of-law rules).

This case does not involve a clear-cut example of work that, by its very nature, cannot rationally be considered to have been performed "about or upon" the Project site (like quarrying and cutting granite blocks in Maine for use in constructing a Manhattan building, as was the case in *Ewen*, 206 N.Y. at 251); nor does this case involve work that is subject to regulation by another state that plainly has a stronger interest in the matter than New York, *see, e.g.*, *Padula*, 84 N.Y.2d at 521-32.  Here, to the extent the work performed by Plaintiffs at the Shop was (as Plaintiffs claim) integral to their work on the Pier A Project and of the type "customarily and usually" performed at the job site, it should be considered work performed about or upon the Project, such that it would fall within the coverage of the Prime Contract's prevailing wage guarantee.  *Cf. Ramaglia*, 5 A.D.3d at 911 (in case involving New York public works contract, considering whether the painting of steel at a manufacturer's factory in Pennsylvania was work "customarily and usually done at the construction site or [was] a normal part of the manufacturing process," and finding that, because it was the latter, workers were not subject to the NYLL prevailing-wage law).

Moreover, to the extent Plaintiffs' claimed travel time to and from the Shop and the job site was "incident to" the labor they performed at the job site, the presumption against the extraterritorial application of the NYLL would not operate to preclude their recovery for that time.  *See Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 RER, 2015 WL 1966355

(E.D.N.Y. May 1, 2015) (awarding plaintiffs compensation for New Jersey travel time under the NYLL, where the time was "incident to [p]laintiffs' labor performed in New York"); *see also* Prime Contract, at 10, § 2.3 (stating that the contract "Work" was intended to include "transportation . . . required to execute and complete the Work" and that Stalco was responsible for all work "incident to" the Work described in the Contract Documents).

> **3.    In This Case, Disputed Factual Issues Regarding the Nature and Extent of the Work Performed by Plaintiffs Off Site Preclude Summary Judgment as to Their Entitlement to Compensation For Such Work.**

For the above-stated reasons, the Court does not find that Plaintiffs are barred, as the result of any absolute rule, from recovering prevailing wage or overtime compensation from Stalco for their off-site work, including their work at the Shop and their travel between the Shop and the job site.  This does not mean, however, that Plaintiffs are necessarily entitled to such recovery, for all hours claimed.

From a policy perspective, if Plaintiffs were actually performing work at the Shop that was not only "customarily and usually done at the construction site," *Ramaglia*, 5 A.D.3d at 911, but was of the very same type as the work they were performing on the job site, then Stalco should bear the risk of any failure by ECS to pay them prevailing wages or overtime for that work, *see Wrobel*, 56 Misc. 3d at 805 ("[A]s between the general contractor, who may choose with whom it subcontracts, and the laborers under the subcontract, the Labor Law makes clear that the general contractor should bear the risk that it has hired a subcontractor who fails to pay a prevailing wage.")

Here, at least some evidence has been presented that tends to show that Plaintiffs, who, as noted above, were performing work that involved the restoration of panels and ornamental work on the Pier A building, did most of that work on site, but did some of the same type of work off

site.  Further, the record shows that – regardless of whether the Shop was a formally

"designated" site for the Pier A Project[21] – Stalco was or should have been well aware of the fact

that some of Plaintiffs' work was being performed at the Shop.

For example, the record reflects that Stalco's project manager, Joseph Serpe, testified as

follows at his deposition:

> Q.    Now, do you have personal knowledge of what activities,
>        under the scope of the ECS work, [were] actually
>        performed off-site, rather than on the Pier A site, other than
>        the actual purchasing of the metal that you mentioned
>        previously?
>
> A.    There was some – there [were] some materials that could
>        not be fabricated on site because of the type of equipment
>        that was required.  So those materials were fabricated off
>        site.

(Savits Decl., Ex. 1 (transcript of deposition of Joseph Serpe, conducted Oct. 13, 2016 ("Serpe

Tr.")), at 34:6-14.)  Indeed, Stalco concedes in its motion that, for certain of their work, Plaintiffs

used a "7500-pound brake machine" that was located only at the Shop.  (Def. 56.1 Resp. ¶ 13.)

Further, more than one of the Plaintiffs testified that, on rainy days, they would often work at the

---

[21] As noted above, Stalco argues that, because the Shop was not a formally "designated or dedicated" site for the Pier A Project, Plaintiffs may not recover for work performed there.  (*See* Def. Mem., at 15 (citing Asselta Aff., Ex. R (Opinion Letter from the New York State DOL, dated Dec. 27, 2016)).)  While such a formal designation would undoubtedly have strengthened Plaintiffs' position, and while, as noted, Stalco has cited a DOL opinion letter suggesting that the presence or absence of such a designation can be an important factor (*see* Asselta Aff., Ex. R, at 2), even the cited letter does not opine that the lack of such a designation is determinative of the general contractor's liability for unpaid prevailing wages (*see id.*).  Moreover, an agency opinion letter is not controlling precedent, *see Reich v. State of N.Y.*, 3 F.3d 581, 588 (2d Cir. 1993) (noting that U.S. Department of Labor's guidance interpreting regulations promulgated under the FLSA are entitled to persuasive, but not controlling, weight); *Aplin v. McCrossen*, No. 12-CV-6312FPG, 2014 WL 4245985, at *4 (W.D.N.Y. Aug. 26, 2014) (declining to accord authoritative weight to opinion letter from Center for Medicaid Services official providing "informal written interpretive guidance" as to certain laws), and Stalco has cited no statutory provision, regulation, or case authority to support its contention that the absence of such a designation would operate as a *per se* bar to Plaintiffs' claim for recovery for their off-site work.

Shop instead of at the job site (Olexiy Solouk Tr., at 90:9-20; Koch Tr., at 35:20-25)), a fact of which (if true) Stalco, through monitoring the job site daily (*see* Noone Tr., at 25:9-26:3 (explaining that his job, as a Stalco supervisor, involved monitoring the Pier A Project site on a daily basis); Savits Decl., Ex. 3 (transcript of deposition of Joseph Fitzpatrick, conducted Sept. 2016), at 12:9-19 (explaining that, as a Stalco supervisor, he oversaw work performed by subcontractors)), would have presumably been aware.

On the other hand, Stalco disputes that Plaintiffs did anywhere near the amount of restoration work at the Shop that they claim to have done.  In this regard, contrary to Stalco's contention that the single, large brake machine was the *only* equipment used by Plaintiff that was not located at the job site (Def. 56.1 Resp. ¶ 13), Plaintiffs contend that most of the types of machines and tools that they needed to perform their work at the job site were located *both* at the job site *and* at the Shop in New Jersey (Pl. 56.1 Stmt. ¶ 13).  Plaintiffs also state in their Rule 56.1 Statement that, in starting their day's work at the Shop, they not only "load[ed] the company vehicle(s) with tools, hardware, trim and/or metal panels," but that, "on many mornings, Plaintiffs fabricated, cut, bent, and/or restored metal panels and/or measured and/or cut wood for on-site carpentry work" – all before leaving the Shop for the job site.  (*Id.* ¶ 9.) Plaintiffs further state that, "on most afternoons," upon returning to the Shop, they "fabricated, cut, bent, and/or restored or duplicated metal panels, cornices, clips, and/or metal and wood elements of the building as needed for the next day's work on the Pier A site when there had been no time to make these on site."  (*Id.* ¶ 12 (citing Koch Tr., at 54:22-55:92, 66:4-69:15; Oleg Solouk Tr., at 47:9-17).)  Plaintiffs also assert that they "often returned to the [S]hop with a list of measurements or drawings they took from the wood and/or metal elements of the building and used those measurements to fabricate, cut, bend and/or restore the materials needed for the next

day." (*Id.* ¶ 14 (citing Koch Tr., at 69:2-15; Oleg Solouk Tr., at 47:9-17).)  Finally, Plaintiffs

assert that they "frequently brought the existing metal elements (which they removed from the

Pier A building) from the Project site to the [S]hop to perform restoration work on those

elements in the evenings at the [S]hop" (*id.* ¶ 15 (citing Koch Tr., at 69:2-15), and that "[a]fter

measuring on the site, they would bring panels back to the [S]hop to restore it [sic] to avoid

working overtime at the site" (*id.* (citing Larsen Tr., at 83:9-19)).

Stalco flatly denies all of these assertions, pointing out that Markota, ECF's principal,

testified at his deposition "that Plaintiffs never loaded materials or tools from the [S]hop into the

van or did any sheet metal work at the shop in the morning, although one or two of the Plaintiffs

put screws and rivets into the van while most of the Plaintiffs drank coffee and smoked

cigarettes."  (Def. 56.1 Resp. ¶ 9.)  Stalco also describes Markota's testimony as attesting "that

Plaintiffs did not do any work at the [S]hop in the afternoons, except that occasionally one or two

of the Plaintiffs made certain panels at the [S]hop, and that everything else was made at the

Pier A site."  (Def. 56.1 Resp. ¶¶ 12, 14, 15 (citing Attorney's Reply Affidavit [of Joseph P.

Asselta] in Support of Stalco Defendants' Motion for Summary Judgment and in Opposition to

Plaintiffs' Cross-Motion, sworn to Mar. 12, 2018 (Dkt. 82), at Ex. U (transcript of deposition of

Ante Markota, conducted Oct. 7, 2017 ("Markota Tr.")), at 188:18-189:12).)  Stalco additionally

states that, according to Markota, "when Plaintiffs stayed at the [S]hop after hours, it was to

drink beer and vodka, which they kept in the [S]hop's refrigerator" (*id.* (citing Markota Tr., at

191:16-25)), and that, even according to plaintiff Koch, "not all of the Plaintiffs did work at the

[S]hop each day, and that sometimes only Oleg [Solouk] did so" (*id.* (citing Koch Tr., at 54:15-

55:17; 66:4-67:18)).

The parties also dispute the extent to which Plaintiffs may have been performing work for jobs other than the Pier A Project, during their time at the Shop.  On this point, Plaintiffs maintain that they were "almost exclusively assigned to the Project," that they worked on "very few" other jobs at the same time "due to the size of the Pier A Project," and that "[m]ost of the other projects were small repairs, could have been months apart, would only take a few days," and involved work that was often performed on Saturdays.  (Pl. 56.1 Stmt. ¶ 8 (citing Markota Tr., at 156:18-166:1); *see also* Pl. 56.1 Resp. ¶ 6 (describing small amounts of time that plaintiffs Oleg Solouk, Yakymiv, Koch, and Larsen worked on other jobs).)  Stalco, however, notes that "Markota testified that Plaintiffs did work for other jobs at the [S]hop while the Pier A [P]roject was in progress" (*see* Def. 56.1 Resp. ¶¶ 12, 14, 15 (citing Markota Tr., at 286:2-15)), identifies seven other jobs on which it contends Plaintiffs worked (Def. 56.1 Stmt. ¶ 6), and points to evidence suggesting that Plaintiffs may be understating the amount of work that they did for those other jobs (*see* Def. 56.1 Resp. ¶ 8 (stating, *e.g.*, that, for seven weeks in April and May 2011, during the period of the Pier A Project, Olexiy Solouk's timesheets indicate that most of his time was spent on other projects)).

Moreover, the parties dispute whether Plaintiffs' travel time between the Shop and the job site was incidental to their work at the site.  While Plaintiffs essentially contend that they needed to begin their day at the Shop so that they could load into a truck or van the panels and other materials that they would need for that day's work at the job site (Pl. 56.1 Stmt. ¶ 9), Stalco not only disputes that Plaintiffs actually loaded materials as they claim (Def. 56.1 Resp. ¶ 9), but states that, according to Markota's testimony, "Plaintiffs went to the [S]hop instead of going straight to the Pier A site because there were no parking spaces at the Pier A site for their cars, so they travelled together to the Pier A site in ECS'[s] van" (*id*.).  As set out above, the parties

41

similarly dispute whether Plaintiffs' return to the Shop in the afternoon was done in specific furtherance of their work on the Project, or as a matter of convenience or to provide a way for Plaintiffs to socialize.  (*See* Pl. 56.1 Stmt. ¶ 12; Def. 56.1 Resp. ¶ 12.)

In light of these substantial disputes regarding what Plaintiffs did at the Shop when they were there and whether their travel between the Shop and the Pier A Project site was incident to their work at the job site, Stalco is not entitled to summary judgment dismissing, in their entirety, Plaintiffs' claims for compensation for work they performed at the Shop or for their travel time. Similarly, while Plaintiffs are entitled to partial summary judgment that Stalco is liable to them for unpaid compensation for any off-site work or travel that was effectively part and parcel of Plaintiffs' work at the job site, issues of material fact preclude the entry of summary judgment in Plaintiffs' favor on the question of whether Stalco's liability extends to all of the off-site hours claimed.  On this point, the Court notes that, while Stalco has seemingly admitted that, at least, some large-panel fabrication work had to be performed at the Shop, Plaintiffs will retain the burden, at trial, of demonstrating to a reasonable certainty the hours spent on such work, and on any other work legitimately compensable by Stalco.

E.     **A Trial Is Required To Determine the**
       <u>**Accuracy of Plaintiffs' Timesheets and Calendars.**</u>

With respect to Plaintiffs' proof of the amount of time they actually worked on the Pier A Project, both on site and off, Stalco contends that Plaintiffs should be limited to using their official timesheets and personal calendars as evidence of their hours.  (Def. Mem., at 10-12.) More specifically, Stalco argues that Plaintiffs "have no way to know (or to prove) how many hours they worked on any particular day," and that the official timesheets should control because Plaintiffs, themselves, completed and signed them, because they are consistent with Plaintiffs' personal calendars (to the extent located and produced), and because they actually reflect at least

certain overtime hours.  (*Id.*)  While these arguments may ultimately prove effective as a means to impeach Plaintiffs' credibility, they are unpersuasive as a ground for awarding Stalco summary judgment on the issue of the hours that Plaintiffs worked.

As an initial matter, despite Plaintiffs' argument in opposition that they should not be judicially "estopped" from claiming hours worked in excess of those reflected on their timesheets and calendars (Pl. Mem., at 13-14; Pl. Reply, at 5-6), the Court notes that Stalco does not appear to be making a "judicial estoppel" argument.  Rather, Stalco's argument appears to be that Plaintiffs' assertions that they worked in excess of the recorded hours are "insufficient to demonstrate a genuine issue of material fact" in light of the documentary evidence that appears to contradict those assertions.  (Def. Reply, at 21-24; *see also* Def. Mem., at 10-12.)  In any event, as judicial estoppel is only relevant where a party has taken separate and inconsistent positions in judicial proceedings, *see In re Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011), and as Plaintiffs have been consistent in their position that they worked more hours than those shown in the documentary evidence, the doctrine of judicial estoppel is inapplicable here.

As to the pertinent inquiry of whether, based on the quality of the evidence presented on the pending motions, Plaintiffs have made an insufficient showing of any additional hours worked to avoid being "bound" by their timesheets and calendars, the Court notes that the record contains sworn deposition testimony from at least four of the six Plaintiffs – Oleg Solouk, Olexiy Solouk, Koch, and Larsen – that they were instructed by ECS to limit, in some fashion, the number of hours they recorded for the company.  (*See* Oleg Solouk Tr., at 51:25-53:5; Olexiy Solouk Tr., at 35:17-23; Koch Tr., at 27:7-28:9; Larsen Tr., at 35:25-37:16, 38:10-21.)  Further, the evidentiary record shows that Olexiy Solouk and Koch each testified that they were instructed by Markota to limit their recorded hours for the work they performed on the Pier A

Project.  (*See* Olexiy Solouk Tr., at 35:17-23; Koch Tr., at 27:7-28:9.)  While Stalco suggests

that this deposition testimony was vague, marked by a lack of specific recollection, and hence

not credible (*see* Def. Mem., at 11 (citing Oleg Solouk Tr., at 30:19-22, 55:8-58:12, and

highlighting the deponent's inability to confirm the precise work he performed on a particular

date, or the precise number of hours he worked on the Project on specified dates)), a plaintiff's

inability to remember details about particular dates referenced at a deposition does not establish

that he would necessarily be unable to sustain his burden of demonstrating at trial, to a

reasonable certainty, the overall number of hours worked on a job.

      In resolving a summary judgment motion, a court's reliance on an employer's time

records to determine the amount of unpaid wages due to an employee is simply improper where

the employee has presented testimonial evidence in admissible form that those records are

incomplete or inaccurate, such that they may not reflect the employee's actual time worked.

*Kuebel v. Black & Decker*, 643 F.3d 352, 3623 (2d Cir. 2011) (vacating summary judgment in

defendant's favor where plaintiff presented evidence that the hours reflected in his timesheets

were inaccurate as a result of management's direction not to record more than 40 hours per

week); *see also Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 716-17 (2d

Cir. 2001) (vacating summary judgment in defendant's favor where plaintiff presented evidence

that her timesheets did not reflect time worked prior to the commencement of her official shift).

The determination as to whether testimonial evidence concerning the falsifications or

inaccuracies of timesheets is credible is "a determination for trial, not summary judgment."

*Kuebel*, 643 F.3d at 363.  Here, in light of the conflicting evidence in the record as to the

accuracy of Plaintiffs' time records, and affording Plaintiffs the benefit of every reasonable

inference in their favor, Stalco has not shown the absence of any triable issue of fact as to the

hours Plaintiffs worked on the Project, and summary judgment on that question must therefore be denied.

## IV.      THE STALCO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNJUST-ENRICHMENT CLAIM.

The Stalco Defendants contend that Plaintiffs' unjust-enrichment claim (their second cause of action) is barred given that the subject matter of Plaintiffs' claims is governed by an express contract, *i.e.*, the Prime Contract.  (Def. Mem., at 16.)  Plaintiffs have failed to respond to this contention in either of the memoranda they submitted in connection with the parties' summary judgment motions, and therefore Plaintiffs must be deemed to have abandoned their unjust-enrichment claim.  *See Kovacko*, 834 F.3d at 143.

In any event, Plaintiffs have offered no evidence to show that any of the Individual Stalco Defendants were personally enriched at Plaintiffs' expense, and, given that Plaintiffs may recover against Stalco on a contract theory, they may not simultaneously proceed against the Stalco Defendants on a quasi-contract claim.  *See Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) ("Numerous decisions applying New York law have held that an unjust enrichment claim is barred 'if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract.'" (emphasis omitted) (quoting *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F.Supp.3d 301, 312 (S.D.N.Y. 2015))).

Accordingly, the Stalco Defendants are entitled to summary judgment dismissing Plaintiffs' unjust enrichment claim against them.

## CONCLUSION

For all of the foregoing reasons, the Stalco Defendants' motion for summary judgment

(Dkt. 71) and Plaintiffs' cross-motion for partial summary judgment (Dkt. 80-1) are both granted

in part and denied in part.  Specifically:

(1)     Summary judgment is granted in favor of defendants Harney, Nahmias, and Serpe as to all of Plaintiffs' claims against them, and Plaintiffs' claims against these defendants are dismissed in their entirety, with prejudice.

(2)     Summary judgment is also granted in favor of defendant Stalco on Plaintiffs' Second, Third, Fourth, and Fifth Causes of Action against them, and these claims, as against Stalco, are likewise dismissed in their entirety, with prejudice.

(3)     As to Plaintiffs' First Cause of Action against Stalco, for breach of contract, Plaintiffs are granted partial summary judgment in their favor as to liability (based on a third-party-beneficiary theory), on the portions of the claim that seek recovery for unpaid prevailing wages and overtime compensation (based on the prevailing wage rates), if any:

      (a)     for time that Plaintiffs spent working at the site of the Pier A Project;

      (b)     for the time Plaintiffs spent working at the Shop, but only to the extent such work is shown, at trial, to have been performed for the Pier A Project and to have been the type of work that was customarily and usually performed by Plaintiffs at the Pier A Project site; and

      (c)     for the time spent by Plaintiffs traveling between the Shop and the Project site, but, as to each plaintiff who is asserting such a claim, only to the extent his travel is shown, at trial, to have been incident to Plaintiffs' work at the job site.

(4)     To the extent Stalco has moved to preclude Plaintiffs from introducing, at trial, any proof of their hours worked that is inconsistent with the hours reflected in their timesheets and produced calendars, Stalco's motion is denied.

In light of the above, the Clerk of Court is directed to close the motion filed in this action as Dkt. 71 and the cross-motion filed as Dkt. 80-1. Counsel for the parties are directed to initiate a conference call to my Chambers on May 15, 2019 at 12:00 p.m. to discuss the status of Plaintiffs' claims against the ECS Defendants and to set a schedule for trial.

Dated: New York, New York
      May 2, 2019

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All Counsel (via ECF)

47